DISTRICT OF COLUMBIA, et
al., Appellants,

v.

Johnny H. COLSTON, Appellee.

No. 81-993.

District of Columbia Court of Appeals.

Argued Sept. 22, 1982.

Decided Oct. 24, 1983.

William J. Earl, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, Washington, D.C., at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for appellants.

J. Gordon Forester, Jr., Washington, D.C., for appellee.

Before NEWMAN, Chief Judge, KERN, Associate Judge, and GREENE, Associate Judge, Superior Court of the District of Columbia.*

NEWMAN, Chief Judge:

The District of Columbia and Metropolitan Police Officer Charles Aldridge (Aldridge) appeal from a judgment against them on a jury verdict in appellee Johnny M. Colston's (appellee or Colston) action for false arrest and assault and battery. Appellee alleged that during the Farmers' March on Washington in February 1979, Aldridge improperly fired a chemical agent into the cab of Colston's tractor, causing permanent loss of the vision in his left eye. He also claimed that he was then arrested and imprisoned without probable cause on charges of assault on a police officer and of reckless driving. After a four day trial, the jury returned a verdict in favor of appellee, awarding him $400,000.

Following the verdict, the District of Columbia and Aldridge moved for a new trial. They alleged that the trial court erred in three particulars: (1) it failed to declare a mistrial after Colston's opening statement, in which the jury was advised of the disposition of the criminal charges on which Colston was allegedly falsely arrested; (2) it permitted Colston to present evidence of the disposition of those charges during his case; and (3) it permitted a closing argument by Colston's counsel allegedly replete with inflammatory and prejudicial comments regarding the injury to Colston's eye. The trial court denied the motion for a new trial. This appeal followed, raising the same issues as those presented in the new trial motion. We affirm.

On February 5, 1979, a sixteen-mile long procession of farm vehicles arrived in Washington, D.C. The farmers in this procession had come to present their grievances to their elected representatives in

Congress. The tractorcade, led by District of Columbia police officers, proceeded east on Independence Avenue toward the Capitol. As it crossed Seventh Street, S.W. through the morning rush-hour traffic, the caravan completely blocked the street and prevented any further movement of traffic. In response, police officers directed the tractors to turn around and proceed north on Seventh Street.

Colston testified that he and other farmers turned around on Independence Avenue and headed west toward Seventh Street. The traffic, however, forced them to drive onto the sidewalk. Colston stated that as he moved along the sidewalk he saw police officers talking to the driver of the tractor stopped in front of him. Thinking that it was stalled, Colston stopped his tractor and waited. Colston testified that he observed police officers knock out a window of the tractor and "smoke" the driver out. He then heard the sound of shattering glass and saw pieces of his left cab window on the floor of his tractor. In response, he put his tractor in reverse. A police car was behind him, however, and he attempted to go forward. At that moment he was struck in the face by a tear gas canister and almost knocked unconscious.

Aldridge testified that tractors were occupying all six lanes of traffic on Independence Avenue and part of the sidewalk. He stated that he observed Colston's tractor moving from the sidewalk toward the street into a crowd of farmers and police officers. According to Aldridge, Colston then used his tractor to interfere with a police crane that was removing another tractor from the intersection. Police officers directed Colston to stop but he continued his interference. Captain George McDonnell of the Police Department tried to get the cab door of the tractor open, but could not because of the erratic movement of the tractor. Aldridge further testified that this erratic movement caused two police officers, who were standing behind Colston's tractor, to jump to the hood of a nearby car to avoid

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1973).

injury. Captain McDonnell then ordered Aldridge to use tear gas to stop Colston. After Sergeant Ronald A. Poole broke the cab window with his baton, Aldridge inserted the muzzle of his riot gun into the cab and fired.

Colston shut off the engine and was assisted out of the tractor. The police arrested him and charged him with assault on a police officer, D.C.Code § 22–505(a) (1981) and reckless driving, D.C.Code § 40–712(b) (1981). Thereafter, he was taken to the George Washington University Hospital emergency room. After emergency treatment was administered, Colston was transferred to D.C. General Hospital and locked in a cell. There, he received no medical treatment, his prescriptions were not filled, and he was left on a metal-framed plywood bed. Later that night, Colston was transferred to the D.C. Jail. The following day he was returned to D.C. General Hospital and was released later that afternoon.

Colston remained in Washington from February 7 to February 14 to receive daily treatment from an ophthalmologist. He was unable to see out of his left eye and had only limited vision in his right eye. After returning to Georgia, Colston began seeing Dr. Roger Smith, an ophthalmologist, on a regular basis. Colston testified that his vision improved slightly until May 1979, when it began to fade rapidly. He described the effects the loss of vision had on his daily life, and stated that he has been virtually blind in his left eye since September 1979. Dr. Smith stated that because of the severity of the injuries, Colston's eye will probably have to be removed in the future.

Thomas Swearengen, an expert on tear gas ammunitions, testified that he was familiar with the type of riot gun used on Colston; he described the mechanical aspects of the gun's function and stated that the shell used was designed to disperse riotous crowds or mobs, but never to be used inside an enclosed space. He also stated that he had viewed the television tape of the incident and that, in his opinion, the gun was used improperly on Colston.

During his opening statement, Colston's counsel advised the jury that the assault charge had been dropped and that a jury had found Colston not guilty of reckless driving. Appellants' objection at the bench to these statements was overruled.

Later, during Colston's direct testimony, his attorney asked him to tell the jury of the disposition of the criminal charge of assault on a police officer. The court then took judicial notice that the prosecuting authorities had elected not to proceed with that charge. Colston also indicated that he was acquitted of the charge of reckless driving by a District of Columbia jury. Appellants' counsel again objected at the bench to the introduction of this evidence, but the court refused to declare a mistrial because, in its view, false arrest was not the significant claim in the case.

After all the evidence had been presented, appellee's counsel made the following remarks in his closing argument:

Consider that loss of that eye as the major element of damages. How much is an eye worth? How much is a healthy eye worth? You cannot restore his vision but you can compensate him for the loss. Is an eye worth five hundred thousand? Eight hundred thousand? A million? That is for you to say. That is for you to decide. But, ask yourself this question. If Johnny Colston on February the fifth had been offered one million dollars for his healthy eye, you ask yourself if he would have accepted? You decide what that eye is worth.

\* \* \* \* \* \*

We can imagine what it is like to lose an eye. You can close one eye. Put your hand on it and walk around for a few minutes or few seconds. But, you think of doing that for all day for all week. Think of doing that for forty five and a half years for the rest of his life. (Tr. 341–42).

Appellants made no objection to these comments at the time and the trial court did not take any action concerning them.

■ Evidence of the dismissal of criminal charges is not admissible in a civil case for false arrest arising out of the same events as the criminal charges. *District of Columbia v. Gandy,* 458 A.2d 414 (D.C.1983). Moreover, evidence of acquittal of criminal charges is also inadmissible in such a civil action. *Accord Gandy, supra* (citing *Galbraith v. Hartford Fire Insurance Company,* 464 F.2d 225 (1972)). The trial court's failure to prevent evidence of the disposition of the charges against Colston from being placed before the jury was error.

In context, however, the error was harmless. *Gandy, supra* (citing *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The evidence of the disposition of criminal charges was placed before the jury twice and then only in the most perfunctory manner. Appellee's counsel mentioned the dismissal and acquittal during his opening statement in literally two sentences. He did not elaborate or suggest that the jury draw any inference therefrom. Colston also mentioned the disposition of the criminal charges during his direct testimony. When asked by his attorney what had happened as to each charge, Colston replied simply that one had been dismissed and that he was acquitted of the other. Moreover, no other testimony or evidence of any kind pertaining to these charges was presented by either party. Finally, counsel did not include in his closing argument any reference to Colston's testimony regarding the charges. Thus, we are satisfied that the trial court's error in permitting the introduction of this evidence was harmless.

■ Appellants also assert that appellee's counsel made improper remarks to the jury during his closing argument. We disagree.[1] In closing argument it is improper for counsel to use "golden rule" arguments in which he asks jurors to place themselves in the plaintiff's position or to "do unto others as you would have them do unto you" in assessing damages. *Klotz v. Sears, Roebuck & Co.,* 267 F.2d 53 (7th Cir.), *cert. denied,* 361 U.S. 877, 80 S.Ct. 141, 4 L.Ed.2d 114 (1959); *Delaware-Olds, Inc. v. Dixon,* 367 A.2d 178 (Del.1976). It is also improper for counsel to suggest to the jury that it award a specified dollar amount. *Purpura v. Public Service Electric and Gas Company,* 147 A.2d 591 (N.J.1959). Nevertheless, counsel must always be permitted to argue that his client's case is a serious one and to

---

1. Counsel made the following argument:

When you get down to it finally, the major element of damage [is] for the loss of his vision in his left eye, and you have seen that eye. He has told you he cannot see out of it. The doctor told you that he cannot see out of it. He has a forty-five and a half year life expectancy because he was 27 years old when this occurred. Consider the loss of that eye as the major element of damages. How much is an eye worth? How much is a healthy eye worth? You cannot restore his vision but you can compensate him for the loss. Is an eye worth five hundred thousand? Eight hundred thousand? A million? That is for you to say. That is for you to decide. But, ask yourself this question. If Johnny Colston on February the fifth had been offered one million dollars for his healthy eye, you ask yourself if he would have accepted? You decide what that eye is worth. You heard his mother, Miss (sic) Colston come to testify about some of the little things that he cannot do. These are the little things, pouring peas and missing the plate, pouring tea and missing the glass, trying to hook a sweep up to a tractor and making a turn at the end of a furrow, trying to weld two pieces of metal together. When you put them all together, they are the daily things that Johnny Colston encounters because he has one blind side. These are the little things that affect his life. We can imagine what it is like to lose one eye. You can close one eye. Put your hand on it and walk around for a few minutes or a few seconds. But, you think of doing that for all day for all week. Think of doing that for forty-five and a half years for the rest of his life....

Ladies and gentlemen, we ask you to consider a substantial award for Johnny Colston. Vision is one of God's most precious gifts next to life itself. When Johnny Colston came here on the fifth of February, he had two good eyes. Until this police officer took one from him. This police officer acting in the scope of his authority took Johnny Colston's eye. I ask you to award Johnny Colston a substantial amount of compensation.

stress those aspects of the case that contribute to its seriousness. *Borger v. Conner,* 210 A.2d 546 (D.C.1965). Furthermore, the fairness of counsel's argument must be assessed in the context of all other evidence and proceedings at trial. *Haigler v. Logan Motor Co.,* 86 A.2d 108, 109 (D.C.1952).

In this case, counsel's argument was not improper. Although some of the *language* he used is similar to that condemned in *Delaware Olds, supra,* we find that it was not used in the *manner* condemned in *Delaware Olds.* In that case, counsel repeated the improper language throughout his summation and used it as a plea for sympathy. In contrast, appellee's counsel here did not make a plea for sympathy and he did not continually ask the jurors to place themselves in Colston's position. Moreover, appellee's counsel did not ask the jury to award a specific dollar amount; he asked only for a "substantial" amount. Neither did he ask the jurors to award the amount of money they would want if they had lost an eye. Indeed, he stressed that it was up to the jury to decide what the loss of an eye was worth. Finally, we note that the trial judge adequately instructed the jury that it was to avoid allowing passion, prejudice, or sympathy to influence its decision.

Thus, we affirm the trial court's judgment.

*So ordered.*