HECHINGER COMPANY, Appellant,

v.

James W. JOHNSON, Appellee.

No. 97–CV–71.

District of Columbia Court of Appeals.

Argued May 11, 1999.
Decided Oct. 26, 2000.

Jeffrey R. DeCaro, Lanham, MD, for appellant.

Marc Fiedler, with whom William P. Lightfoot, Washington, DC, was on the brief, for appellee.

Before WAGNER, Chief Judge, and STEADMAN and RUIZ, Associate Judges.

WAGNER, Chief Judge:

Appellant, Hechinger Company, appeals from a judgment entered following a jury verdict of $2,000,000 for appellee, James W. Johnson. The case arose out of Johnson's claim for damages for injuries he sustained as the result of an assault upon him by Hechinger's employee while Johnson was a patron at one of Hechinger's retail stores. Hechinger makes numerous arguments on appeal. Finding no error requiring reversal, we affirm.

## I. *Factual Background*

Johnson testified that on Saturday, February 12, 1994, he went to a Hechinger store in Langley Park, Maryland to purchase lumber. While waiting to have the wood cut, he noticed a group of people who were having lumber cut place the scrap pieces in a nearby dumpster. Johnson and others asked the people for the unused scraps, and they gave Johnson about five pieces. When Johnson went to the cashier to pay for his own purchases, the cashier asked the price of the scraps of wood. Johnson responded that the other customers had given them to him, and the cashier stated that Hechinger did not give away wood. The cashier then telephoned a supervisor or someone in charge. According to Johnson, a man approached who was in his thirties and wearing a blue smock or shirt with Hechinger lettering on the pocket and a badge identifying himself as a Hechinger employee. The cashier explained the problem, and the man asked Johnson how he had obtained the wood. Johnson told him about the other customers giving him their scraps of wood, and the man informed Johnson that Hechinger did not give away wood. After the two had further discussion about how Johnson acquired the scraps, the employee struck Johnson in the chest. Johnson fell backward, and his head slammed into the counter. Johnson managed to pull himself up. He saw the store manager, John A. Brown, running and yelling to the man, to "get away from him." While Johnson and Brown were discussing what had transpired, the employee who had cut the wood and the customers who had given him the scraps arrived at the counter and confirmed Johnson's account about how he acquired the wood scraps. William Beims, an acquaintance of Johnson's, was walking past the front of the store. He testified that he saw the man push Johnson down and then saw another man run in between them.

Johnson testified that when he left the store, he felt a sharp pain near his left temple. He became dizzy and lightheaded, and he was trembling and sweating profusely. He pulled his car in front of the store to load the wood he had purchased and lost consciousness for some period of time. When he regained consciousness, Johnson finished loading the wood and drove away.

During the damages phase of this bifurcated trial, Dr. Michael Batipps, a neurologist, testified that upon admission to the hospital, Johnson was given a computer-

ized axial tomography scan (CAT scan) which revealed a subdural hematoma in the left side of Johnson's head.[1] Dr. Joel Falik, a neurosurgeon, gave an opinion that the head trauma that Johnson experienced at the Hechinger store caused Johnson's condition.

There was medical evidence that Johnson's brain was effectively pushed out of alignment, which combined with swelling, compressed his brain structures enough to be life-threatening. A neurosurgeon performed an emergency craniotomy, which involved cutting a piece out of Johnson's skull and opening up the membrane covering his brain, draining off liquid, and removing the clotted portions by irrigating the brain's surface with a saline solution which was suctioned out. Johnson's brain did not fully shift back into its proper position. Dr. Batipps opined to a reasonable degree of medical certainty that Johnson's brain injury was permanent. The brain injury impaired Johnson's mental functioning to the left hemisphere of .his brain, which controls speech, memory, writing, mathematical and mechanical skills and most daily thought processes. Johnson scored in the impaired range on tests of speech-sound perception, memory, auditory attention, and verbal information-learning as a result of his injuries. His IQ fell from over 130 to 109. He experienced severe headaches and incontinence, depression, anxiety, and insomnia, all attributed to the injury. His personal and professional life as a practicing attorney since 1975 also suffered. Other facts relevant to disposition of the appeal are set forth in the discussion of the issues which follows.

## II. *Forum Non Conveniens*

Hechinger argues that the trial court erred in the denying its motion to dismiss on the ground of *forum non conveniens.* It contends that Maryland is the more appropriate forum because the alleged in-

cident occurred there, Maryland law applied, and Johnson resided in Maryland. Hechinger further contends that the trial court denied its motion under the mistaken belief that Johnson resided in the District of Columbia, a factor which, in any event, it contends is not controlling. Johnson argues that the record shows that he was a resident in the District at the time relevant to this issue and that the trial court did not abuse its discretion in denying the motion. Johnson contends that, in any event, dismissal at this stage of the proceedings is unjustified under the doctrine.

We start with the familiar standard applicable here that the decision of the trial court granting or denying a motion to dismiss on the grounds of *forum non conveniens* will not be disturbed on appeal absent a clear showing that it abused its broad discretion. *Cresta v. Neurology Ctr., P.A.,* 557 A.2d 156, 159 (D.C.1989); *Carr v. Bio–Medical Applications of Wash., Inc.,* 366 A.2d 1089, 1091–92 (D.C.1976) (citations omitted). In exercising its discretion, the trial court must apply the doctrine in light of well-established criteria against which this court will review its action. *Id.* at 1092. Specifically, the court must consider both private and public interest factors. *Id.* As to the former, these relate to the relative ease, expedition, and expense of the trial, including, for example: "relative ease of access to proof; availability and cost of compulsory process; the enforceability of a judgment once obtained; evidence of an attempt by the plaintiff to vex or harass the defendant by his choice of forum; and other obstacles to a fair trial." *Id.* (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). Public interest factors include "administrative difficulties caused by local court dockets congested with foreign litigation; the imposition of jury duty on a community having no relationship to the litigation; and the

1. A subdural hematoma was described as an accumulation of blood between the surface of

the brain and the membrane that covers it.

inappropriateness of requiring local courts to interpret the laws of another jurisdiction." *Id.* (citing *Gulf Oil,* 330 U.S. at 508–09, 67 S.Ct. 839). Upon review, this court will make an independent evaluation of the issue in light of these public and private interest factors. *Cresta,* 557 A.2d at 159 (citations omitted).

■ Against these factors, we find no clear abuse of discretion in the trial court's ruling. Observing that a plaintiff's choice of forum is entitled to some deference, the trial court denied the motion because Johnson "is a District resident and [Hechinger] maintains a significant presence in this jurisdiction." Although the events out of which this case arose occurred in nearby Maryland, Hechinger does not dispute that it conducted a substantial business within the District, as the trial court determined. Indeed, Hechinger does not contend that trial in this neighboring jurisdiction created impediments to a fair trial or that Johnson filed the case in the District to harass it. *See Carr, supra,* 366 A.2d at 1092. Thus, Hechinger has failed to identify any significant factors which support weighing in its favor the private interest concerns which guide our analysis. *See id.*

■ Hechinger relies exclusively upon its claim that Johnson is not a resident of the District, a claim it made in its motion in the trial court. Johnson responded then, and contends now, that at the time relevant to the *forum non conveniens* issue, he resided in the District with his aunt on Meade Street, N.E. After denying the motion to dismiss, the trial court received Hechinger's reply "rais[ing] a substantial question regarding [Johnson's] residence," and therefore, amended its initial order denying the motion to dismiss to make it without prejudice to Hechinger resubmitting the motion after discovery concerning Johnson's address. In its order, the court stated, "[s]hould it be determined that the Court's prior Order was based on a misunderstanding of the facts regarding plaintiff's residency, the Court

would be willing to reconsider its Order date[d] April 7, 1995." The record on appeal does not show that Hechinger ever filed a motion in response to this order. Hechinger's failure to pursue the issue consistent with the trial court's ruling precludes it from raising the issue now. In any event, in spite of Hechinger's claim that Johnson was a non-resident, there is evidence of record that he resided in the District at least from the time of the assault through the pre-trial proceedings. A suit filed in this jurisdiction by a resident against a corporation which maintains a significant presence in the District may be a matter of sufficient local interest to defeat dismissal on *forum non conveniens* grounds. *See Washington v. May Dep't Stores,* 388 A.2d 484, 487 (D.C.1978). Relying on appeal only upon the residency issue, which fails, Hechinger has not shown compelling reasons affecting public or private interest considerations which suggest that Johnson's choice of forum should be disturbed. *See Gulf Oil, supra,* 330 U.S. at 508, 67 S.Ct. 839 (unless the balance of concerns strongly favor the defendant, "the plaintiff's choice of forum should rarely be disturbed.")

■ Another reason compels rejection of Hechinger's argument. "The 'purpose of the doctrine of *forum non conveniens* ... is to avoid litigation in a *seriously inconvenient forum,* rather than to ensure litigation in the most convenient forum.' " *Cresta, supra,* 557 A.2d at 161 (quoting Casad, Robert C., JURISDICTION IN CIVIL ACTIONS, ¶ 1.04 at 1–20). After months of pre-trial preparation and full trial, the inconvenience which the doctrine seeks to avoid has already occurred. At this stage, the parties have incurred the expenses and inconvenience of trial, and the burdens on the court's docket have already been imposed. Hechinger could have filed an interlocutory appeal of the denial of its motion but chose not to. *See Frost v. Peoples Drug Store, Inc.,* 327 A.2d 810, 811 (D.C. 1974). That consideration weighs heavily in favor of continuing jurisdiction in the

District. *See Jimmerson v. Kaiser Found.*, 663 A.2d 540, 545 (D.C.1995); *Wilburn v. Wilburn*, 192 A.2d 797, 801 (D.C. 1963).

### III. *Mention of Dollar Figure in Closing Argument*

Hechinger argues that the trial court erred in permitting Johnson's counsel to argue to the jury that Johnson's injuries were worth in excess of $1,000,000 and suggesting figures of $1,000,000, $2,000,000 and $3,000,000. Hechinger contends that Johnson's counsel made this improper argument to subvert the trial court's rulings precluding the jury from awarding monetary damages for future medical expenses and future loss of income. Hechinger contends that the jury was swayed by counsel's improper argument as evidenced by its verdict which was at the midpoint of the figures suggested by Johnson's counsel and that, as a result, the jury included compensation for future medical expenses and income losses prohibited under the court's rulings and instructions to the jury. Johnson argues that his counsel's closing argument closely tracked those held by this court not to be improper in *District of Columbia v. Colston*, 468 A.2d 954 (D.C. 1983). He contends that he did not suggest that the jury award a specific amount and that he emphasized that it was for the jury to decide what Johnson's injuries were worth. Further, he contends that the court's instructions to the jury prevented any possible prejudice.

▮ In this jurisdiction, it is improper for counsel to suggest to the jury that it award a specific dollar amount. *See Colston, supra*, 468 A.2d at 957 (citing *Purpura v. Public Serv. Elec. and Gas Co.*, 53 N.J.Super. 475, 147 A.2d 591 (1959)). The assessment of the amount of damages is a matter exclusively within the jury's province. However, counsel is permitted to stress those aspects of the case which make the client's claim substantial or serious. *Id.* at 957–58 (citing *Borger v. Conner*, 210 A.2d 546 (D.C.1965)).

Johnson's counsel alerted the trial court to his intention to make an argument about damages consistent with that in *Colston* which was determined not to transgress the rule prohibiting mention of a dollar amount. In *Colston*, the plaintiff was seeking damages for the loss of an eye, and his counsel made the following argument to the jury:

> Consider that loss of that eye as the major element of damages. How much is an eye worth? How much is a healthy eye worth? You cannot restore his vision but you can compensate him for the loss. *Is an eye worth five hundred thousand? Eight hundred thousand? A million? That is for you to say. That is for you to decide.* But, ask yourself this question. If Johnny Colston on February the fifth had been offered one million dollars for his healthy eye, you ask yourself if he would have accepted? You decide what that eye is worth. (Emphasis added)

> \* \* \* \*

> We can imagine what it is like to lose an eye. You can close one eye. Put your hand on it and walk around for a few minutes or few seconds. But, you think of doing that for all day for all week. Think of doing for forty five and a half years for the rest of his life.

*Colston*, 468 A.2d at 956. Although recognizing that the language was similar to that condemned in *Delaware Olds, Inc. v. Dixon*, 367 A.2d 178 (Del.1976), this Court determined that the argument was not improper. In relevant part, the following explanation was given:

> [C]ounsel here did not ... continually ask the jurors to place themselves in Colston's position. Moreover, appellee's counsel did not ask the jury to award a specific dollar amount; he asked only for a "substantial" amount. Neither did he ask the jurors to award the amount of money they would want if they had lost an eye. Indeed, he stressed that it

was up to the jury to decide what the loss of an eye was worth. Finally, ... the trial judge adequately instructed the jury that it was to avoid allowing passion, prejudice, or sympathy to influence its decision.

*Colston,* 468 A.2d at 958.

■ Counsel for Johnson obviously carefully crafted his argument in this case after the argument in *Colston.* His argument went this way:

> Mr. Johnson is here today seeking full and fair compensation for his injuries. And he has a substantial injury, substantial losses. You have heard testimony from his psychologist, from his neuro surgeon.
>
> The question is, how do you measure damages to the brain? ... He is brain damaged. It is without dispute. Your job is to figure out how to compensate him for this. How do you measure his losses?
>
> I can't tell you what his injuries are worth. That's up to you to determine how much he is to receive. *I can't tell you if it is a million dollars, if it is two million dollars, or if it is three million dollars. That is for you to decide.* (Emphasis added).
>
> What I can do, though, is go through how you should appropriately measure those damages. And you are going to have in the jury room the jury instructions on damages. And this is one of them. You look to the extent and duration of any bodily injuries sustained. What's the extent of it? It is permanent.

There is no material difference between the dollar figure argument sanctioned in *Colston* and the one that Johnson's counsel made in this case. Neither counsel asked the jury to award a specific dollar amount, and both told the jury that it was for them to decide the proper measure of damages. Here, Johnson's counsel referred the jury to the instructions on damages which the trial court would give and which they would have in the jury room. Similar to *Colston,* the trial court instructed the jury that it must base its decision on the evidence, without sympathy, prejudice or passion, and that the statements of counsel are not evidence. The jury is presumed to follow the court's instruction. *Brock v. United States,* 404 A.2d 955, 959 (D.C. 1979) (citation omitted). Assessing counsel's argument in context, and in light of the *Colston* decision, counsel's argument was not improper.[2]

### IV. Evidentiary Challenges

#### A. Denial of Motion to Exclude Witness' Testimony

Hechinger argues that the trial court erred in allowing Johnson's witness, William Beims, to testify because he was not identified as a corroborating witness until ten days prior to trial. It contends that Johnson knew that Beims was a potential witness as early as several months after the incident, but did not identify him on any witness list, pre-trial statement, answers to interrogatories or in deposition testimony, to the prejudice of Hechinger. Hechinger contends that Johnson was required by Super. Ct. Civ. R. 16(b)(2) to identify the witness or be precluded from calling the witness.[3]

**2.** As long as the rule prohibiting a specified dollar amount argument obtains in this jurisdiction, parties seeking to walk a fine line between the permissible and the impermissible in argument place their verdicts at risk with the potential for costly retrials. Rather than continue these risks as skillful counsel continue to find new ways to suggest figures to the jury without violating the rule, the en banc court may have to consider the continued validity of the prohibition.

**3.** Rule 16(b)(2) provides in pertinent part:

> each party must file and serve a listing, by name and address, of all fact witnesses known to that party, including experts who participated in, and will testify about, pertinent events. No witness may be called at trial, except for rebuttal or impeachment purposes, unless he or she was named on the list filed by one of the parties on or before [the due] date or the calling party

■ As Hechinger acknowledges, the rules permit the trial court to modify a pre-trial order in its discretion, for good cause shown. *See* Super. Ct. Civ. R. 16(g); *Taylor v. Washington Hosp. Ctr.,* 407 A.2d 585, 592 (D.C.1979), *cert. denied,* 446 U.S. 921, 100 S.Ct. 1857, 64 L.Ed.2d 275 (1980). The decision whether to allow a lay witness to testify who has not been identified as a witness in a pretrial order is within the sound discretion of the trial court, and its decision will not be disturbed absent an abuse of discretion. *See Taylor,* 407 A.2d at 592. In this case, the trial court found that Johnson's mental deficiencies contributed to the delay in disclosing the witness and that neither Johnson nor his counsel acted in bad faith in identifying the witness late. Further, the court considered that Hechinger had the opportunity to depose the witness about a week prior to trial. Neither side requested a continuance. The court factored in potential prejudice to both sides, but found on balance that the evidence should be admitted. The trial court properly balanced considerations relevant to its discretionary ruling. *See, e.g., Weiner v. Kneller,* 557 A.2d 1306, 1311–12 (D.C.1989).[4] We conclude that the trial court did not abuse its discretion in allowing Beims, an essential corroborating witness to the assault, to testify.

### B. *Admissibility of Statement for Medical Diagnosis and Treatment*

■ Hechinger challenges the admission of Johnson's statement to his treating physician, Dr. Joel Falik, recorded in a medical report. The statement involved Johnson telling his doctor that he had been hit in the head at a Hechinger store. Over Hechinger's objection, the report was admitted under an exception to the hearsay rule for out-of-court statements made for purposes of medical diagnosis or treatment. "Under the medical diagnosis exception to the hearsay rule, statements made by a patient for purposes of obtaining medical treatment are admissible for their truth because the law is willing to assume that a declarant seeking medical help will speak truthfully to medical personnel." *Galindo v. United States,* 630 A.2d 202, 210 (D.C.1993). Statements about the cause of the patient's injuries come within the exception "because explaining the cause of injuries may facilitate treatment." *Id.* (citing *Sullivan v. United States,* 404 A.2d 153, 158 (D.C.1979)). Hechinger does not claim that the statement was not made in the course of medical diagnosis and treatment. It argues that the statement should not have been admitted in the liability phase of this bifurcated trial because treatment issues were not then before the jury. We disagree. How Johnson came to be injured is clearly relevant to the liability phase of the trial. Complaints of assault are admissible under the exception for statements made to treating physicians. *See id.* at 210–11; *Sullivan,* 404 A.2d at 158–59.

■ Hechinger seems to object implicitly to statements implicating it in the inci-

---

can establish that it did not learn of the witness until after this date.

Also relevant to the discussion, Super. Ct. Civ. R. 16(e) provides that only witnesses whose names are listed may testify at trial, except for purposes of impeachment or rebuttal.

4. At issue in *Weiner* was whether to allow expert testimony improperly left out of a statement filed under Super. Ct. Civ. R. 26(b)(4). *Weiner, supra,* 557 A.2d at 1311. The following factors were identified as being relevant to this determination:

(1) whether allowing the evidence would incurably surprise or prejudice the opposite party;

(2) whether excluding the evidence would incurably prejudice the party seeking to introduce it;

(3) whether the party seeking to introduce the testimony failed to comply with the evidentiary rules inadvertently or willfully;

(4) the impact of allowing the proposed testimony on the orderliness and efficiency of the trial; and

(5) the impact of excluding the proposed testimony on the completeness of information before the court or jury.

*Id.* at 1311–12.

dent. Statements of fault are generally excluded from the medical diagnosis exception. *Id.* (citing *Sullivan, supra,* 404 A.2d at 159 & n. 11). Assuming that the statement contained an impermissible statement of fault, any error in its admission was harmless. *See Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Johnson testified at trial concerning where and how the assault occurred. His testimony was corroborated by Beims. Thus, the evidence from the medical report that Johnson reported an assault at Hechinger's establishment to his doctor was cumulative.

## V. Sufficiency of Scope of Employment Evidence

Hechinger argues that the trial court erred in denying its motion and renewed motion for judgment as a matter of law because Johnson failed to provide sufficient evidence that the conduct of the Hechinger employee who struck him was a direct outgrowth of his instructions or job assignment. Johnson contends that there was sufficient evidence for the jury to find Hechinger vicariously liable for its employee's tortious assault.

 The court may enter judgment as a matter of law only where, viewing the evidence in the light most favorable to the non-moving party, "the probative facts are undisputed and where reasonable minds can draw but one inference from them." *Johnson v. Weinberg,* 434 A.2d 404, 407 (D.C.1981) (citations omitted) (*Johnson I* ). Applying that standard, it is " 'only when the evidence is so clear that reasonable men could reach but one conclusion' " that

the motion should be granted. *Id.* (citing *Bauman v. Sragow,* 308 A.2d 243, 244 (D.C.1973)). Likewise, "[a] judgment notwithstanding the verdict is proper only in cases 'in which no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party.' " *Finkelstein v. District of Columbia,* 593 A.2d 591, 594 (D.C.1991) (en banc) (quoting *Oxendine v. Merrell Dow Pharmaceuticals, Inc.,* 506 A.2d 1100, 1103 (D.C.1986)). Against that standard, there was adequate evidence to prove that Hechinger's employee assaulted Johnson within the scope of his employment.

 "[R]espondeat *superior* is a doctrine of vicarious liability which imposes liability on employers for the torts committed by their employees within the scope of their employment."[5] *Weinberg v. Johnson,* 518 A.2d 985, 988 (D.C.1986) (*Johnson II* ) (citations omitted). Under the doctrine, an employer is subjected to liability for acts of his employee because of his employment and in furtherance of the employer's interests. *See id.* (citing *Penn Central Transportation Co. v. Reddick,* 398 A.2d 27, 29 (D.C.1979)). If the employee's actions are only done to further his own interests, the employer will not be held responsible. *See id.* (citations omitted). However, if the employee acts in part to serve his employer's interest, the employer will be held liable for the intentional torts of his employee even if prompted partially by personal motives, such as revenge. *See id.* (citing *Jordan v. Medley,* 228 U.S.App.D.C. 425, 428, 711 F.2d 211, 214 (1983)) (other citation omitted).

5. Conduct of an employee is considered generally to be within the scope of employment if:
 (a) it is of the kind he is employed to perform;
 (b) it occurs substantially within the authorized time and space limits;
 (c) it is actuated, at least in part, by a purpose to serve the master, and
 (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
*Johnson I, supra,* 434 A.2d at 408 (quoting RESTATEMENT (SECOND) OF AGENCY, § 228 (1957)).

■ In this case, there is evidence that the assault grew out of a job-related controversy. Johnson testified that the incident was precipitated by a discussion concerning some scraps of wood which he had obtained from another customer. The cashier informed Johnson that she was going to call a supervisor when he claimed that the wood had been given to him. According to Johnson's testimony, in response to the cashier's call, a man approached wearing a blue smock or shirt with "Hechinger" stitched on it and a name badge identifying himself as a Hechinger employee.[6] According to Johnson, the man acted like he was in charge. He asked the cashier what the problem was, and after she responded, he questioned Johnson and argued with him about paying for the scraps of wood. He told Johnson that Hechinger did not give away wood. The man then struck or pushed Johnson. It was reasonable for the jury to conclude that the man's actions were motivated by a desire to require Johnson to pay for the wood which he presumed to be the property of his employer, Hechinger. It was also reasonable for the jury to conclude that the employee acted on behalf of his employer to resolve a job-related dispute. Such evidence was adequate to support a finding that the man was responsible for handling disputes with customers and that he acted, at least partially, by a desire to serve Hechinger's interests. *See Johnson II*, 518 A.2d at 988. The evidence was sufficient for the jury to find Hechinger vicariously liable for its employee's actions.[7]

## VI. *Denial of Motion for New Trial or Remittitur*

Hechinger argues that the trial court erred in denying its motion for a new trial, or in the alternative, to alter or amend the judgment. Hechinger contends that it is entitled to a new trial because the jury ignored the court's instructions in reaching a verdict of $2,000,000. It bases its argument upon the affidavit of one of its store managers, John A. Brown, who spoke with a juror after the jury returned its verdict. Although the trial court instructed the jury that there was no claim for future medical expenses and future lost wages or earning capacity, according to the affidavit, the juror told Brown that the jury considered these elements. Hechinger also contends that the jury misunderstood the court's proximate cause instructions and that the verdict is so excessive that it is beyond reason and shocks the conscience.

■ Generally, a juror may not impeach his or her verdict as to matters which inhere in the verdict itself, "as opposed to extraneous influences." *Sellars v. United States*, 401 A.2d 974, 981 (D.C. 1979) (citations omitted). Under this standard, for example, jurors can challenge the verdict where they had learned of publicity unfavorable to the defendant. *See id.* (citing *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959)) (other citations omitted). There is a wide range of conduct, which inheres in the verdict, for which impeachment will not be allowed. *See id.* at 981–82. Thus, jurors cannot impeach their verdicts on grounds that "that they failed to follow instructions";[8] "that they had been confused";[9] or "that they did not understand their

---

6. Johnson sought the identity of the employee through discovery, but Hechinger could not provide the information because the attendance records and possibly the incident report were destroyed by fire.

7. Hechinger seems to challenge the sufficiency of the evidence based upon Johnson's inability to identify the employee by name and job title. We are persuaded that reasonable jurors could find from the evidence, both direct and circumstantial, that the man who

assaulted Johnson was a Hechinger employee in a supervisory position.

8. *See id.* at 982 (citing *Domeracki v. Humble Oil & Refining Co.*, 443 F.2d 1245, 1247–48 (3d Cir.), *cert. denied*, 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 165 (1971)).

9. *Id.* at 982 (citing *Queen v. District of Columbia Transit System*, 364 A.2d 145, 148–49 (D.C.1976)).

instructions." [10] The rationale underlying the rule is aimed at:

> (1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and open discussions among jurors; (3) reducing incentives for jury tampering; (4) promoting verdict finality; (5) maintaining the viability of the jury as a judicial decision-making body.

*Id.* at 981 (citations omitted).

▮▮▮ Hechinger's arguments for jury impeachment relate to matters which inhere in the verdict. It contends that the jury ignored the court's instructions, based their award on conjecture and speculation, was confused, and misunderstood the court's instructions on proximate cause. Such conduct does not provide a valid basis for impeachment of the verdict. *See Sellars, supra,* 401 A.2d at 982 (citations omitted). While Hechinger argues that the jury considered evidence not properly admitted in evidence as relates to its alleged calculation of the future losses and medical costs, this is essentially an argument that the jury failed to follow the court's instructions with respect to damages. The Brown affidavit explains, according to the juror interviewed, the mental processes by which the jury arrived at its verdict. Such matters do not form an appropriate basis for jury impeachment.

▮▮▮ We find no error in the trial court's decision denying a remittitur or new trial because the verdict was excessive. Whether to grant a new trial based on excessiveness of a jury verdict is entrusted to the sound discretion of the trial court, and that decision will not be disturbed absent a showing of abuse of discretion. *See Finkelstein, supra,* 593 A.2d at 596. This standard requires close scrutiny in order to determine whether

> there is firm support in the record for a finding by the trial judge that the verdict is "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate," given the respect accorded the judge's "unique opportunity to consider the evidence in the living court-room context."

*Johnson II, supra,* 518 A.2d at 994 (quoting *Lacy v. District of Columbia,* 408 A.2d 985, 988–89 (D.C.1979)) (further citation omitted).

▮▮▮ Here, there is evidence that Johnson's injuries were severe and permanent. There was evidence that Johnson sustained significant brain damage, loss of intelligence, memory and psychological and physical problems as a result of his injuries. According to the evidence, because of his limitations, Johnson lost confidence in his ability to practice law again. He experienced seizures, incontinence, bizarre behavior and loss of self esteem, among other problems. We can not say that the trial court abused its discretion in concluding that the verdict was not so excessive as to warrant a remittitur.

For the foregoing reasons, the judgment appealed from hereby is

*Affirmed.*[11]

▮▮▮▮▮▮

---

10. *Id.* at 982 (citing *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 602 n. 30 (5 th Cir., *cert. denied*), 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974)) (other citations omitted).

11. We reject summarily Hechinger's claim that the trial court abused its discretion in denying its motion for a mistrial based on alleged judicial bias or misconduct. This argument is premised upon the claim that the trial court was biased because it precluded Hechinger from introducing into evidence an exhibit offered before the case was submitted to the jury, while it had allowed Johnson to introduce the testimony of Beims, even though he was not identified until shortly before trial. Adverse rulings which occur during trial, such as this one, are not the proper subject of bias claims. *See In re J.A.,* 601 A.2d 69, 75–79 (D.C.1991). Finally, in

light of our disposition of the other issues in
the case, we need not decide whether cumulative errors prejudiced Hechinger.

