**Viola J. SCOTT, Appellant**

v.

**CRESTAR FINANCIAL CORPORATION, et al., Appellees.**

No. 99–CV–694.

District of Columbia Court of Appeals.

Argued June 1, 2000.

Decided July 26, 2007.

Richard L. Swick, Washington, DC, for appellant.

Abbey G. Hairston, with whom A. Neal Barkus, Washington, DC, was on the brief, for appellees.

Before WASHINGTON, Chief Judge, RUIZ, Associate Judge, and TERRY, Senior Judge.*

TERRY, Senior Judge:

Appellant, Viola Scott, filed suit against her former employer, Crestar Financial Corporation, and her immediate supervisors, Yolette Olufemi and Stuart Henderson, alleging employment discrimination based on national origin and personal appearance, as well as unlawful retaliation. At the end of a four-day trial, the jury returned a verdict in favor of Ms. Scott on the national origin and retaliation claims and awarded her one million dollars in compensatory damages. After the parties filed post-trial briefs, the court granted Crestar's motion for a new trial, based upon certain prejudicial remarks contained in the closing argument of Ms. Scott's counsel and the excessiveness of the verdict.

When the case went to trial a second time before a different judge, there were no new witnesses, nor was any additional evidence presented that had not been offered at the first trial. This time, however, the jury returned a verdict for Crestar on all counts. From the judgment on that verdict, Ms. Scott noted this appeal. Before this court she makes two arguments: (1) that the trial judge at the first trial abused his discretion by granting Crestar's motion for new trial, and (2) that the same judge erred in refusing to enter judgment on the verdict immediately, pursuant to Super. Ct. Civ. R. 58.[1] We reject both arguments and affirm the judgment.

---

* Judge Washington was an Associate Judge of the court at the time of argument. His status changed to Chief Judge on August 6, 2005.

 Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

1. Ms. Scott does not contend that any reversible error occurred at the second trial.

## I

Appellant, Viola Scott, is a black woman and a native-born United States citizen. In August 1978 she began working as a part-time teller at the Riggs Park branch of Perpetual Savings Bank. She was promoted to the position of full-time teller in May 1981 and eventually to the position of teller supervisor.

In 1992 Perpetual was merged into Crestar Bank. Ms. Scott was hired by Crestar as a head teller and continued to work at the Riggs Park branch. In 1994 Crestar appointed Yolette Olufemi, a Haitian-born, naturalized United States citizen, to be the branch manager at Riggs Park. Thereafter Ms. Olufemi promoted Ms. Scott to customer service representative and became her immediate supervisor. Ms. Scott and Ms. Olufemi initially worked well together, but after a while tensions arose in their relationship. According to Ms. Scott, Ms. Olufemi began "making comments about African–American–born black women ... how they thought they were better than women born of other nationalities," and occasionally made unwelcome comments about Ms. Scott's clothing.[2]

Ms. Scott testified that Ms. Olufemi often favored non-American black employees from Sierra Leone and Nigeria. In one instance Ms. Olufemi fired Deanne Cox, an American-born assistant branch manager, for an incident involving an automatic teller machine (ATM), but did not discipline Naffie Turray, from Sierra Leone, even though both women were responsible for improperly loading the ATM by placing five-dollar bills into the twenty-dollar canisters.

In 1995 Ms. Scott began having problems with A.C. Waters, a security guard assigned to the bank. According to Ms. Scott, "He would literally stand up and look down toward my drawer and at my hands as I counted the money." Ms. Scott testified that Waters did not watch any of the other tellers in this way. She reported the problem to Ms. Olufemi, who agreed to keep an eye on Mr. Waters and take action if warranted. Months passed, but Ms. Olufemi did not contact Ms. Scott about any further action regarding Mr. Waters.

On February 7, 1996, following another incident with Mr. Waters, Ms. Scott approached Ms. Olufemi in her office. Ms. Scott explained that she was still uncomfortable with the working environment and suggested that Mr. Waters work on days when she was not assigned to the teller window. In response, Ms. Olufemi suggested that Ms. Scott apply for a transfer to a different branch. Ms. Scott rejected this proposal, noting that Mr. Waters was the one causing the problem. The following day Ms. Olufemi told Ms. Scott that Mr. Waters would be assigned to another branch.

During this same period, Katrine Bartree, another teller at the Riggs Park branch, asked Ms. Scott to verify her employment status and income to Gwendolyn Johnson, a property manager at Wingate Associates.[3] Ms. Bartree had submitted an application to lease an apartment from

2. Ms. Scott said that Ms. Olufemi would say such things as "I bet you spend a lot for your clothes. Where do you shop? You look nice in that." Although these remarks appeared to be complimentary, Ms. Scott considered them as derogatory because she felt she was dressing no differently from anyone else, and because she thought it was improper for Ms. Olufemi to make such comments about her wardrobe.

3. At trial this witness identified herself as "Gwendolyn Williams," but she stated that, at the time of the events at issue here, her name was Gwendolyn Johnson. We will accordingly refer to her in this opinion as Ms. Johnson.

Wingate and listed Ms. Scott as her supervisor. When Ms. Johnson called to confirm the information, Ms. Scott told her that Ms. Bartree's salary was $24,000. Thereafter, however, Ms. Johnson discovered that this figure and Ms. Bartree's pay stubs "just didn't match."[4]

Upon learning of the discrepancy, Ms. Johnson called Ms. Olufemi. It was during this conversation that Ms. Olufemi learned that Ms. Scott had released personal information about a bank employee to a third party. Crestar's Standards of Conduct, a document containing regulations which govern all bank employees, required that all requests for information about current or former employees be referred to the Office of Human Resources. Ms. Olufemi told Ms. Johnson that the salary verified by Ms. Scott was inconsistent with the pay stubs provided by Ms. Bartree. Thereafter Ms. Olufemi consulted with her supervisors about the appropriate way to deal with what had happened.

Approximately one week later, Ms. Olufemi directed Ms. Scott to attend a meeting at the bank's headquarters. Present at that meeting were Ms. Olufemi, Ms. Scott, Ms. Bartree, and Stuart Henderson, a Crestar manager. Ms. Scott believed that the meeting was called to discuss the guard situation and Mr. Waters' transfer. At the meeting, however, Ms. Scott was questioned about the information she had provided on Ms. Bartree's behalf. At the conclusion of the meeting, Ms. Scott was placed on administrative leave pending an investigation of the matter. Thereafter Ms. Olufemi contacted Jean Williams, a

Crestar Vice President, and discussed the situation with her.

On February 21, 1996, Ms. Scott was summoned to a second meeting at Crestar headquarters. She was again questioned at length about the telephone call from Ms. Johnson and was given an opportunity to provide any new information. At the conclusion of the meeting, she was informed that she was being terminated for breaching Crestar's Standards of Conduct. Ms. Scott testified that after leaving the meeting she "felt ashamed, embarrassed, degraded, and humiliated." In addition, she could not sleep, lost her appetite, and had frequent headaches and crying spells.[5] Following her discharge, Ms. Scott applied for teller jobs at Nations Bank, Citizens Bank, and other financial institutions, but with no success.

Yolette Olufemi testified that Ms. Scott was a good employee and said that she "gave her the highest evaluation of anyone in the branch." Furthermore, she said, she never commented on Ms. Scott's wardrobe or personal appearance. With respect to the information given to the apartment manager, Ms. Olufemi said that the decision to terminate Ms. Scott was based on the fact that she knew the information should have been provided by Human Resources but disclosed it anyway. Finally, Ms. Olufemi stated that Ms. Williams and Mr. Henderson had both recommended that Ms. Scott be discharged.

Stuart Henderson, market manager for Crestar, and Jean Williams, a Crestar executive, also testified. Mr. Henderson said that at the time Ms. Scott was fired, he had been involved in about ten termi-

---

**4.** Ms. Johnson did not testify as to the amount of the discrepancy between Ms. Bartree's salary as reported by Ms. Scott and Ms. Bartree's actual salary, except to say that the true figure was "a lot lower." However, at the second trial, another witness—Jean Williams,

a Crestar executive—testified that Ms. Bartree's "actual salary" was "close to $15,000."

**5.** Ms. Scott subsequently sought medical attention and was prescribed a thirty-day supply of Amitriptylene.

nations involving fraud at the bank. He added that disciplinary cases were approached on a case-by-case basis and that termination was not required in every case. Ms. Scott's discharge, he said, was the first one involving the release of confidential information. Both witnesses agreed that the employee orientation checklist included a reference to the Standards of Conduct and that each employee was responsible for checking the box indicating that he or she had read those standards.[6] In addition, they both testified that copies of the Standards of Conduct were distributed to the employees every year.

## II

During his closing argument at the first trial, Ms. Scott's counsel made the following remarks to the jury:

I mean Crestar is a big bank. They are real successful in the banking industry. They are everywhere now—the District, Maryland, Virginia, other places.... But I think sometimes you got to get through to somebody that the law applies to them too.

That it's not good enough just to let things happen like this. That it is up to Crestar to have a EEO policy that they enforce and not allow someone like Ms. Scott to lose her job under these sort of circumstances.... And you just have to get through [to] them. I can't get through to them. Ms. Scott couldn't get through to them. The only one who could get through to them is you, that this is not the way things are done; that the law applies to them and that dis-

crimination isn't acceptable, it doesn't make any difference who they have there or why they're doing it....

We think the purpose of the jury in our system is to be the conscience of the community. And that is the job you have. And now, as the conscience of the community, it's time for you to set right what has been an injustice and to take corrective action, to—Crestar didn't do the right thing when it had the chance to do it. It's time now to correct that and see that the right thing is done with regard to Viola Scott.

Counsel for Crestar did not object to this argument or to a similar argument made by Ms. Scott's counsel in rebuttal.[7] The jury returned a verdict in favor of Ms. Scott and awarded her one million dollars in compensatory damages.[8]

Almost immediately after the jury announced its verdict, the trial court, from the bench, directed the parties to file post-trial briefs and stayed the judgment. Crestar later filed a motion for judgment as a matter of law pursuant to Super. Ct. Civ. R. 50, in which it argued that Ms. Scott had not presented a prima facie case of discrimination and that Crestar had offered evidence of legitimate non-discriminatory reasons for firing her. In response, Ms. Scott filed a motion to enter judgment in accordance with Super. Ct. Civ. R. 58, arguing that the court was required by the rule to enter judgment "forthwith" and could not entertain post-trial briefs until after the entry of judgment.

6. Ms. Scott did not check the box next to "Standards of Conduct" on her copy of the forms.

7. In rebuttal, Ms. Scott's counsel stated, *inter alia:* "I agree with [counsel for Crestar], be fair to everyone about it, but a verdict that

lets Crestar know that they can't have this kind of stuff, that this stuff has got to stop."

8. Prior to closing argument, the court had struck Ms. Scott's claim for punitive damages.

After considering these motions, the court entered an order "giv[ing] the parties an additional opportunity, if they wish, to brief the issue of whether the Court should grant a new trial on liability and/or damages pursuant to Superior Court Civil Rule 59(d). If they wish, the parties may include additional arguments on the issue of remittitur." Crestar accordingly filed a motion for new trial, apparently arguing that the evidence could not support such a large award of compensatory damages and that the improper closing argument of Ms. Scott's counsel so inflamed the jury that it could not and did not fairly weigh the evidence.[9]

In a fifteen-page order, the court granted Crestar's motion for new trial. In its order the court said:

Plaintiff is correct that her counsel never used the specific phrase "send a message" in closing argument. As the court reviews the words that were used by plaintiff's counsel in closing argument, however, the court concludes that a fair reading of what was argued demonstrates that the clear import and intent of what counsel argued was to ask the jury to "send a message" to defendants.

The fact that plaintiff's counsel did not use the precise words, "send a message," does not affect the analysis of the issue here. Indeed, on two separate occasions in his closing argument, plaintiff's counsel asked the jury to be the "conscience of the community." This phraseology is harmful when it is used to invite the jury to look to improper or extraneous factors in evaluating the evidence and reaching a verdict.

There is no doubt that, had defendants made any objection at trial, the plaintiff could have sought leave to clarify her argument, and/or the court could have instructed the jury to disregard specific arguments made by plaintiff's counsel or have given the type of curative instruction used by Judge Walton in *McGriff.*[10]

In this case, however, the court is not without some responsibility for the current state of the case. As evident by the court's comments after instructions ... the court was troubled by the arguments of plaintiff's counsel but took no action *sua sponte*. Putting aside any jurisprudential discussion about the role of the judge when both parties are represented by experienced and competent counsel ... it is clear that the court should have intervened during closing arguments. In the absence of objection by defendants, however, the court will examine this matter within the context of plain error.

On the evidence presented to the jury, the court concludes that the verdict returned by the jury was excessive. Even though plaintiff was unemployed for almost two years, suffered humiliation, embarrassment and emotional distress ... the jury's award was extraordinarily disproportionate to the injuries and losses claimed.

The court further believes that the excessive verdict was based upon sympathy for the plaintiff and a desire to "send a message" to the big bank, Crestar, just as plaintiff's counsel requested. But even without considering the size of the verdict, the court concludes that

---

9. We say "apparently" because Crestar's motion for new trial is not included in the record on appeal, although Ms. Scott's opposition is, along with Crestar's reply. From those two documents, and from the court's subsequent order, we can reasonably infer what was in Crestar's original motion.

10. *See McGriff v. United States*, 705 A.2d 282, 288 (D.C.1997).

plaintiff's counsel's closing argument so infected the jury's analysis of the question of liability as to make the verdict on liability inextricably linked to the improper argument. The court further concludes that the failure to grant a new trial would result in a miscarriage of justice because the influential and infectious power of the closing argument of plaintiff in this case directly impacted upon the integrity of the trial.

Crestar's motion for judgment as a matter of law was denied.

## III

### A. *Standard of Review*

■ Ms. Scott argues that the trial court, after the first trial, abused its discretion in granting Crestar's motion for a new trial. Our review of an order granting a new trial is limited to deciding whether the court abused its discretion. *E.g., Lyons v. Barrazotto,* 667 A.2d 314, 322 (D.C.1995); *Washington v. A. & H. Garcias Trash Hauling Co.,* 584 A.2d 544, 545 (D.C.1990) (citing *Oxendine v. Merrell Dow Pharmaceuticals, Inc.,* 506 A.2d 1100, 1110 (D.C.1986)).

■ We have often held that the trial court has "broad latitude" in ruling on a motion for new trial. *Faggins v. Fischer,* 853 A.2d 132, 140 (D.C.2004) (citations omitted). Moreover, the trial court has " '*the power and [the] duty* to grant a new trial if the [verdict is] against the clear weight of the evidence, or *if for any reason or combination of reasons justice would miscarry if [the verdict] were allowed to stand.*' " *Fisher v. Best,* 661 A.2d

1095, 1098 (citation omitted and emphasis added).[11] We further declared in *Faggins:*

> [W]hen acting on a motion for new trial, the trial judge need not view the evidence in the light most favorable to the non-moving party. "Indeed, the judge can, in effect, be the 'thirteenth juror'; he [or she] may 'weigh evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict.' "

853 A.2d at 140 (citation omitted); *accord, Fisher v. Best,* 661 A.2d at 1098.

Indeed, this court and other courts have held that it is "the duty of the judge" to set aside a verdict which "will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict. The exercise of this power is not in derogation of the right of trial by jury but is one of the historic safeguards of that right." *Eastern Air Lines, Inc. v. Union Trust Co.,* 99 U.S.App. D.C. 205, 209, 239 F.2d 25, 29 (1956), *cert. denied,* 353 U.S. 942, 77 S.Ct. 816, 1 L.Ed.2d 760 (1957), *quoted with approval in Fisher,* 661 A.2d at 1098 (citing additional cases). Noting that the trial court's discretion in ruling on a motion for new trial is "broad," we said in *Fisher* that "[t]he trial judge's latitude in passing upon a motion for a new trial is greater than that accorded to an appellate court." *Id.* (citations omitted).

### B. *Excessive Damages*

■ We first consider the issue of whether the trial judge abused his discretion in setting aside the jury's award of one million dollars in damages. The record fully supports the judge's view that

---

11. "Where the court grants a new trial because the verdict is against the clear weight of the evidence, we will scrutinize to assure that the trial court did not simply accept one version of the facts over another." *Faggins,* 853 A.2d at 140 (citation omitted). In this case,

however, as Ms. Scott acknowledges in her brief, the trial judge did not ground his decision on the theory that the verdict was against the clear weight of the evidence; indeed, on this record, no such theory would have been tenable.

this compensatory damages award was excessive. An excessive verdict is one which "is 'beyond all reason, or ... is so great as to shock the conscience.'" *Wingfield v. Peoples Drug Store, Inc.*, 379 A.2d 685, 687 (D.C.1977) (citation omitted); *see Otis Elevator Co. v. Tuerr*, 616 A.2d 1254, 1261 (D.C.1992); *Phillips v. District of Columbia*, 458 A.2d 722, 724 (D.C.1983); *Graling v. Reilly*, 214 F.Supp. 234, 235 (D.D.C. 1963) (the test is whether the verdict "is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate").

■ Excessiveness refers not only to the amount of the verdict but to whether, in light of all the facts and circumstances, the award of damages appears to have been the product of passion, prejudice, mistake, or consideration of improper factors rather than a measured assessment of the degree of injury suffered by the plaintiff. *See District of Columbia v. Murtaugh*, 728 A.2d 1237, 1241 (D.C.1999); *Gebremdhin v. Avis Rent–A–Car System, Inc.*, 689 A.2d 1202, 1204 (D.C.1997); *Moss v. Stockard*, 580 A.2d 1011, 1035 (D.C. 1990); *May Dep't Stores v. Devercelli*, 314 A.2d 767, 775 (D.C.1973). In other words, an award of damages "must strike a balance between ensuring that important personal rights are not lightly disregarded, and avoiding extravagant awards that bear little or no relation to the actual injury involved." *Phillips*, 458 A.2d at 726 (citation omitted). It "must be proportional to the harm actually suffered," and the jury must be "instructed to focus on such harm in fixing compensatory damages." *Id.* (citations omitted).

In this case, the trial court devoted much of its order granting a new trial to the fact that the award of one million dollars in damages was "extraordinarily disproportionate to the losses claimed" and that it "does indeed 'shock the conscience,' given the magnitude of the evidence submitted to the jury." The court acknowledged that after Ms. Scott was terminated by Crestar, she did not work for two years and suffered some emotional distress. The court also noted, however, that Ms. Scott earned only $24,000 a year at Crestar and, by her own testimony, suffered only mild physical symptoms as a result of the termination.[12]

The charge of breaching Crestar's Standards of Conduct was indeed a serious matter. Crestar claimed that Ms. Scott was aware of these standards but still revealed confidential information. Although the jury at the first trial chose to credit Ms. Scott's account of what happened, it is extremely difficult to justify a million-dollar award of damages on the evidence presented. It was reasonable for the trial court to conclude that the comments made by Ms. Scott's counsel during his closing argument—notably, his focus on Crestar as a "big bank" and his emphasis on how difficult it was to "get through to them"—were "inextricably linked to the excessive verdict." We are satisfied that the record fully supports the trial court's determination that the amount of the award was "extraordinarily disproportionate to the injuries and losses claimed" and that the disposition was attributable to the improper remarks made by Ms. Scott's counsel.

### C. *Liability*

■ We turn now to the substantially more difficult question of whether the trial

---

**12.** Ms. Scott consulted a physician twice after she was fired, complaining of headaches, loss of appetite, and difficulty in sleeping. Her physician testified that on the second visit, approximately three months after her discharge by Crestar, Ms. Scott "felt much improved" and was ready to seek new employment.

judge went too far, and abused his discretion, by setting aside the jury's finding of liability. Although the judge referred in his order to "the closeness of the evidence," he did not find that the verdict was against the "clear weight of the evidence." The ordering of a new trial on the question of liability can be justified, if at all, only by the improper "send a message" argument of plaintiff's counsel, coupled with the excessive and, indeed, extravagant award of a million dollars to a woman who was earning $24,000 a year and suffered relatively minor emotional and physical distress. We must decide whether the trial judge could reasonably conclude that the jury's passion or prejudice, generated by the improper argument and reflected in the excessive award, carried over to the finding that Crestar was liable.

The issue is not an easy one, for we readily acknowledge that it might well have been within the judge's discretion to sustain the finding of liability. Moreover, the jurors found in favor of Ms. Scott on only two counts of a three-count complaint. They rejected her claim of discrimination based on personal appearance, thereby suggesting that they may have been carefully analyzing each claim rather then acting from passion or prejudice. Further, as the trial judge recognized in his order, the attorney for Crestar did not object to the offending argument; if objection had been made, or if the judge had intervened *sua sponte*, the situation might possibly have been salvaged. However, "one cannot unring a bell," *Thompson v. United States*, 546 A.2d 414, 425 (D.C.1988) (citation omitted), and we cannot be sure that a curative instruction would have undone the damage. Finally, as the judge expressly recognized in a footnote in his order, "a trial

court should exercise great restraint in setting aside the verdict of a jury." *See Fisher*, 661 A.2d at 1098. Such restraint is called for in order to protect the parties' right to a jury trial. *Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 90 (3d Cir.), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960).[13]

Significantly, on the other hand, the trial judge reasonably believed that he was confronted with an improper closing argument which appealed to and, indeed, instigated prejudice on the part of the jury, casting Crestar as a large, rich, and uncaring Goliath and Ms. Scott as a financially overmatched David. The jury's excessive award of damages might reasonably be viewed as reflecting prejudice against Crestar not only in relation to the amount of actual damages, but also with respect to the case as a whole.

■■■ The trial judge was on the scene, and he was in the best position to perceive, at first hand, not just the content but also the tone of counsel's closing argument and to assess its likely impact upon the jury. The judge thus had the unique opportunity "to view the proceedings [from] a perspective peculiarly available to him alone." *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 216, 67 S.Ct. 752, 91 L.Ed. 849 (1947). "Determination of whether a new trial should be granted ... calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case, which no appellate transcript can impart." *Id.* (citations omitted). Indeed, as Judge Jerome Frank has recognized, "[t]he best and the most accurate [stenographic] record is like a dehydrated peach; it has neither the substance or flavor of the fruit before it was dried." *Broadcast Music,*

13. We note, however, that in this case Ms. Scott was not denied a jury trial; rather, the judge ordered a new jury trial, unaffected by counsel's inflammatory argument. The second trial resulted in a verdict for Crestar, and no error is claimed in that regard.

*Inc. v. Havana Madrid Restaurant Corp.,* 175 F.2d 77, 80 (2d Cir.1949), *quoted in Morris v. United States,* 728 A.2d 1210, 1215 (D.C.1999). The trial court is thus in a better position than an appellate court to determine whether remarks of counsel are prejudicial. *Herman v. Hess Oil Virgin Islands Corp.,* 524 F.2d 767, 772 (3d Cir. 1975). It is for these reasons that so much latitude is accorded to the trial judge— more than to an appellate court, *Fisher,* 661 A.2d at 1098—in making a decision of this kind. "We do not substitute our judgment for that of the trial court." *Smith v. Alder Branch Realty Limited Partnership,* 684 A.2d 1284, 1289 (D.C.1996). This is especially true when, as in this case, the proper exercise of discretion turns so heavily on the sights and sounds of courtroom combat.

The trial judge in this case approached the issue before him responsibly, carefully weighing the costs involved in ordering a new trial.[14] Ultimately, he concluded that the improper closing argument deprived Crestar of its "substantial right to a fair trial," that failure to grant a new trial would result in a "miscarriage of justice," and that "the influential and infectious power of the closing argument ... directly impacted upon the integrity of the trial." We cannot say that this assessment was unreasonable, or that it constituted an abuse of the judge's broad discretion. Even assuming that the judge could permissibly have declined to order a new trial as to liability, "[a] discretionary call, by definition, is one that allows more than one decision." *Smith,* 684 A.2d at 1289. The judge's disposition was a rational and, thus, a permissible one. He reached his decision after ordering the parties to brief

the issue, carefully weighing the competing contentions, recognizing that to order a new trial would be financially and emotionally costly, but nevertheless holding that a new trial was required in order to avoid a miscarriage of justice. Under these circumstances, we simply cannot say that the judge abused his discretion.

## IV

■■■ Ms. Scott also contends that Super. Ct. Civ. R. 58 required the trial court to enter judgment on the verdict immediately after the first trial and that it had no discretion to withhold the entry of judgment. This contention is refuted by the language of the rule itself. Rule 58, like its federal counterpart, FED.R.CIV.P. 58, provides that "[u]pon a general verdict of a jury ... the Clerk, *unless the Court otherwise orders,* shall forthwith prepare, sign, and enter the judgment" (emphasis added). Moreover, quite apart from the rule, "[i]t is a well-recognized principle that courts, under the general supervisory powers over their process, have the discretionary power to temporarily stay execution of their own judgments whenever it is deemed necessary to accomplish the ends of justice." *Conrad v. Medina,* 47 A.2d 562, 565 (D.C.1946); *accord, e.g., Finance America Corp. v. Moyler,* 494 A.2d 926, 931 (D.C.1985).

■■■ In this case, the court had before it Crestar's motion for judgment as a matter of law, Ms. Scott's opposition, Ms. Scott's Rule 58 motion, and (later) Crestar's motion for new trial. Rule 58 expressly gives to the trial court the power to order the clerk not to enter judgment. Although that power should be exercised sparingly to avoid delay and confusion, in

---

**14.** The judge stated in his order:

The Court does not grant this relief lightly, particularly given Defendants' failure to object, the failure of the Court to have inter-

vened during the argument, and the recognition of the financial and emotional costs that will be associated with a re-trial.

some cases delay may be appropriate—for example, when the court has reserved decision on a motion for a directed verdict or when, as in the present case, there is pending before it a motion for new trial or for some other form of post-trial relief. *See Charles v. Daley,* 799 F.2d 343, 347 (7th Cir.1986); 12 MOORE'S FEDERAL PRACTICE ¶ 58–03[3] (3d ed. 1995). Recognizing that the various motions raised numerous issues, the trial court did not enter judgment but gave both parties additional time to brief those issues. On this record, and given the plain language of Rule 58 ("unless the court otherwise orders"), we find no abuse of discretion and no violation of the rule.

## V

For the foregoing reasons, we hold that the trial judge in the first trial did not abuse his discretion by granting Crestar's motion for a new trial. We also hold that there was no violation of Civil Rule 58. Accordingly, the judgment entered after the second trial is

*Affirmed.*[15]

---

15. The court sincerely regrets the unusual delay in issuing this opinion.