FISHER, Associate Judge:
This case concerns a lawsuit based on the tortious conduct of “off duty” police officers at a restaurant. The officers assaulted a patron, and they engaged in other harmful actions. Following trial in the Superior Court, a jury awarded ap-pellees Remi and Veronda B anúdele a total of $203,000 in compensatory and punitive damages against multiple defendants, including appellants Michael Callahan, Hosam Nasr, and Kathleen Wiedefeld, Metropolitan Police Department (“MPD”) officers. The jury also found that Officers Callahan, Nasr, and Wiedefeld acted within the scope of their employment with the District of Columbia.
The individual officers filed a timely appeal. They argue that (a) the evidence did not support the jury’s award of punitive damages against them, and (b) the award of compensatory damages was excessive as a matter of law. The District also noticed an appeal, and now contends that (a) the Bamideles failed to give it adequate notice of their claims in accordance with D.C.Code § 12-309 (2001), (b) the evidence failed to show that the officers acted within the scope of their employment, and (c) it cannot be held liable for punitive damages.
We conclude that the trial court did not abuse its discretion by declining to reduce the compensatory damages award. Moreover, there was sufficient evidence to demonstrate that Officers Callahan, Nasr, and Wiedefeld acted with malice and willful disregard of the safety and rights of others, thus justifying the jury’s decision to award punitive damages against them. We note, however, that the trial court’s order of judgment does not set forth the *519 amount of punitive and compensatory damages that the jury awarded against each individual defendant. We agree with the District that, on the evidence presented, it cannot be held liable for compensatory or punitive damages.
Accordingly, we reverse the judgment against the District of Columbia. We affirm the judgments against the individual officers, but renjand with instructions to amend and reenter the judgment order to fully reflect the jury’s verdicts against them.
I. FACTUAL SUMMARY
The police officers disputed much of the factual summary' which follows, but we are obliged to view the record in the light most favorable to Mr. and Mrs. Bamidele. See, e.g., Giordano v. Sherwood, 968 A.2d 494, 497 (D.C.2009); Croley v. Republican Nat’l Comm., 759 A.2d 682, 690 (D.C.2000). Viewed in that light, the testimony and other evidence presented at trial revealed that on the evening and early morning hours of February 2-8, 2007, Officers Callahan, Nasr, and Wiedefeld, off-duty and not in uniform, went to Clyde’s Restaurant for drinks. When Clyde’s closed, the officers moved to the Szechuan Gallery restaurant, where they were able to obtain more alcohol after lawful serving hours ended. The Bamideles were already in the restaurant when the officers arrived. Officers Callahan and Nasr were carrying their service weapons, despite an MPD policy prohibiting the consumption of alcohol while carrying a weapon.
At some point after the officers arrived, a confrontation arose between them and a group of unidentified men. How this confrontation began was a matter of dispute at trial. According to the Bamideles, Officer Wiedefeld appeared to be flirting with the unidentified men, which evidently angered Officers Nasr and Callahan. The officers and the unidentified men began throwing food and other items between their tables. During this exchange, Officer Callahan threw a plate, which shattered against the wall behind Mrs. Bami-dele’s head, having almost struck her.
But according to the officers, the dispute began when one of the unidentified men sexually assaulted Officer Wiedefeld. They testified that, as she was walking from the bathroom to her table, one of the men grabbed her “rear.” After she returned to the officers’ table and told Officers Nasr and Callahan what had happened, the unidentified men began throwing food. Then, when a piece of broccoli struck Officer Callahan, he “lost his cool” and he approached the men, identifying himself and Officers Wiedefeld and Nasr as police officers. This precipitated a “shoving match” between Officer Callahan and one of the men, which quickly devolved into “wrestling.” Officer Callahan and the man grappled with each other, knocking into and turning over tables in the crowded restaurant.
Observing the encounter, the Bamideles decided to leave the restaurant. As they made their way out, Mr. Bamidele stopped to complain to Officer Callahan about the plate that almost struck Mrs. Bamidele. Officer Callahan readily apologized. But, as Mr. Bamidele and Officer Callahan were speaking, someone[1] sitting at the *520 officers’ table stood up and punched Mr. Bamidele in the face.
According to the Bamideles, the officers then viciously assaulted Mr. Bamidele. Officer Nasr stood up from the table, called Mr. Bamidele an “[ajscidia moota”[2] and began beating him: When Mrs. Bami-dele tried to intervene, the officers knocked her to the floor. They continued to batter Mr. Bamidele, knocking him to the floor and stomping on him. As Mr. Bamidele climbed back to his feet, the officers shoved him against a* wall; Officer Wiedefeld “pinned down” Mr. Bamidele and the other officers continued to beat him. Mrs. Bamidele begged the officers to stop, crying out, “Don’t do this. Don’t do this. Stop it.” Unable to interrupt the assault, she fled to the restaurant entrance, where she called out for help.
Officer Phillip Henderson responded to reports of an altercation within the restaurant. When he entered, he noticed that the restaurant was in disarray: tables had been overturned, food and plates littered the floor, and a “plate was stuck in the wall of the restaurant.” He also saw an ongoing “physical dispute” or “assault.” Officers Callahan and Wiedefeld were holding Mr. Bamidele against a wall. After Officer Henderson was unable to draw their attention by slapping his baton against a wooden banister, he physically intervened and pulled the officers off Mr. Bamidele. Officer Henderson described Officer Callahan as “loud,” “bouncy,” “upset,” and “uncontrollable” while he was being interviewed by Captain Brown, who had arrived at the scene. Sergeant Harpe, another officer who had responded, eventually arrested Officer Callahan for assault, a charge that was later dismissed.
Roughly one year after the assault, the Bamideles brought suit against the District of Columbia, alleging, among other things, assault and battery. They later amended their complaint to add the three officers and the Szechuan Gallery Restaurant as defendants. The lawsuit proceeded to trial, after which the jury returned a verdict in the Bamideles’ favor. In total, the jury awarded them $203,000 in damages, including $70,000 in compensatory damages and $110,000 in punitive damages against the individual officers.[3] The jury also found that the officers acted in the scope of their employment.
Following trial, the District moved for judgment notwithstanding the verdict, or in the alternative for a new trial. It contended that the evidence failed to show that the individual officers acted in the scope of their employment. It also requested a remittitur, arguing that the compensatory damages were excessive. Finally, the District asserted that the award of punitive damages was improper as a matter of public policy, and that the officers did not act with malicious intent.
*521 The Superior Court denied the District’s motion. Concluding that there was evidence to show the officers had been acting in the scope of their employment, the court cited “testimonial evidence in the trial record: that the officers intended — at least in part — to take official police action in response to an assault against one of them.” As to the District’s request for a remittitur, the court held that “[t]he compensatory damage verdict ... is well inside the ‘maximum limit of a reasonable range’ for a jury to award[,]” given “the harm suffered by [the Bamideles], including physical beating, humiliation, and emotional distress.” The trial court rejected the District’s arguments as to punitive damages, finding, among other things, that “the award here will tend to discourage the conduct demonstrated by the officers in this case, which will undoubtedly redound to the public benefit.”
II. The Officers’ Liability
The individual officers claim that the awards of compensatory damages are excessive and that the trial court should have granted a remittitur. They also maintain that there is no basis for the punitive damages awards, because the Bamideles offered no evidence to show that the officers acted with malice. We disagree.
A. Compensatory Damages
Under our case law, if the trial court determines that a particular damages award is “beyond all reason, or ... is so great as to shock the conscience,” it may require the plaintiff to accept a reduced award or face a new trial. Scott v. Crestar Fin. Corp., 928 A.2d 680, 688 (D.C.2007) (quoting Wingfield v. Peoples Drug Store, 379 A.2d 685, 687 (D.C.1977)). In determining whether such a reduction is appropriate, the trial court should consider not only the size of the award, but also whether the decision of the jury was based on “passion, prejudice, mistake, or [the] consideration of improper factors.... ” Scott, 928 A.2d at 688. We “will not reverse the trial court’s denial of a motion for ... remittitur unless the trial court has abused its discretion.” Daka, Inc. v. Breiner, 711 A.2d 86, 100 (D.C.1998).
Here, the trial court reasonably concluded that the jury’s award was not so incongruous with the Bamideles’ actual injuries as to “shock the conscience.” Like the trial court, we are persuaded that the Bamideles presented evidence from which the jury could reasonably conclude that they suffered significant physical injuries, pain, and emotional distress. In particular, Mr. Bamidele testified that, in addition to sustaining a deep gash to his left shin and bruising about his body, he experienced backaches as well as “unbearable” headaches as a result of the officers banging his head “on the back of the wall.” Moreover, he continued to suffer from headaches, backaches, and persistent neck stiffness more than three years after the attack. As a result of the attack, he still experiences “a lot of fear.” Specifically, he “fear[s] the police now — the D.C. police. I don’t come to D.C. at night any longer.” He dwelled on the assault each time he came into the District, and the attack impacted his mental well-being to the point that it affected his relationship with his children. Mrs. Bamidele also described her physical injuries to the jury: she suffered a scratch to her leg during the scuffle.[4] There was also evidence to suggest that Mrs. Bamidele suffered significant emotional distress traceable to the officers’ *522 violent assault of her husband as she begged them to stop.
In sum, we are satisfied that there was sufficient evidence presented at trial to justify the jury’s compensatory awards. And, on this record, we cannot say that the trial court abused its discretion by concluding that the jury’s compensatory damages award was not “beyond all reason, or ... so great as to shock the conscience.” United Mine Workers of Am., Int'l Union v. Moore, 717 A.2d 332, 341 (D.C.1998) (quoting Wingfield, 379 A.2d at 687).
B. Punitive Damages
Officers Callahan, Nasr, and Wiedefeld also argue that there was no basis for awarding punitive damages, because the Bamideles failed to present clear-and-convincing evidence that the officers acted with malice. In particular, they claim that, while there may have been sufficient evidence to establish the assault itself, as-saultive conduct standing alone does not demonstrate malice.
To recover punitive damages, the plaintiff must prove more than mere tor-tious conduct; plaintiff must also prove by clear-and-convincing evidence that the defendant’s tortious acts were “accompanied by conduct and a state of mind evincing malice or its equivalent.” District of Columbia v. Jackson, 810 A.2d 388, 396 (D.C.2002) (quoting Jonathan Woodner Co. v. Breeden, 665 A.2d 929, 938 (D.C.1995)). To establish “malice or its equivalent,” the plaintiff must prove two things: (1) “the defendant acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure, or in willful disregard for the rights of the plaintiff’; and' (2) “the defendant’s conduct itself was outrageous, grossly fraudulent, or reckless toward the safety of the plaintiff.” District of Columbia v. Jackson, 810 A.2d at 396 (quoting Croley, 759 A.2d at 695). In determining whether the plaintiffs carried this burden at trial, we view the evidence in the light most favorable to their cause, asking only “whether there was evidence from which a jury reasonably could find the required malicious intent or willful disregard of another’s rights.” Tolson v. District of Columbia, 860 A.2d 336, 345 (D.C.2004) (quoting King v. Kirlin Enters., 626 A.2d 882, 884 (D.C.1993)).
While “[p]unitive damages are not allowable in every case of assault and battery,” they are permissible “where there is evidence of actual malice, wanton conduct, deliberate violence, or intent to injure.” King, 626 A.2d at 884 (quoting Wanis v. Zwennes, 364 A.2d 1193, 1195 (D.C.1976)). In distinguishing between assaultive conduct that will justify punitive damages and that which will not, we have considered “all the facts and circumstances of the case,” looking in particular to “the aggravated nature of the defendant’s conduct (and, inferentially, [his or her] state of mind).... ” King, 626 A.2d at 884.
The record shows that the Bami-deles sustained their burden to “prove, by a preponderance of the evidence, that [Officers Callahan, Nasr, and Wiedefeld] committed a tortious act, and by clear and convincing evidence that the act was accompanied by conduct and a state of mind evincing malice or its equivalent.” Croley, 759 A.2d at 695. Therefore, we see no reason to disturb the trial court’s post-trial ruling that “the record evidence and all inferences drawn therefrom support a finding of outrageous and reckless conduct sufficient to support the [punitive damages] award[s]” against the individual officers. The record permitted the jury to conclude that the officers’ conduct was sufficiently aggravated to support an inference that they intended to injure Mr. Bam-idele. The jury could have inferred this intent not merely from the sheer intensity *523 of the assault, but also from the officers’ flagrant disregard for the safety of those around them.
In reaching this conclusion, we look to the contrast between our decisions in King and Croley. In Croley, two Republican National Committee security guards accosted the plaintiff as he was photographing a dumpster adjacent to an RNC office building. 759 A.2d at 686. When the plaintiff would not stop taking pictures, one of the guards pulled him to the ground and placed his foot on the plaintiffs chest. Id. at 686, 696. The plaintiff did not allege that the guards delivered other blows, engaged in any sustained assaultive conduct, or committed any acts placing him in physical danger prior to the assault. See id. at 686. Nor did the guards make any aggressive comments or gestures tending to reveal their malicious intent. Id. at 686, 696. This conduct, we held, was insufficient to justify the award of punitive damages, and we held that the trial court did not err in refusing to submit that issue to the jury. Id. at 696.
In King, by contrast, the defendant violently assaulted the plaintiff after the two men were involved in a traffic incident. 626 A.2d at 883. The defendant first angled his car into the plaintiffs lane, causing the plaintiff to pull his car to the side of the road. Id. As the plaintiff exited his car, the defendant rushed him, yelling racial epithets while throwing repeated punches to the plaintiffs head. Id. When the plaintiff warded the defendant off with a knife, the defendant briefly retreated. Id. But, when the plaintiff returned his weapon to his car, the defendant immediately resumed his attack. Id. Based on this evidence, we held that a jury could reasonably conclude that the defendant “harbored an ‘evil motive’ toward [the plaintiff] and engaged in ‘deliberate violence’ against him.” Id. at 884.
The case at hand is more like King than Croley. As in King, the individual defendants in this case engaged in conduct prior to the assault which endangered the plaintiffs’ safety: they threw objects across the restaurant, one of which almost struck Mrs. Bamidele. Furthermore, the assault in this case and the assault in King both came after essentially no provocation: Before the attack, Mr. Bamidele merely told Officer Callahan -in a “quiet way” that the “next time you throw plates, be careful where it [sic] lands.” Cf. id. at 884 (“[A] jury could find that [the defendant] initiated a second assault without any provocation.”). Another factor likening this case to King, but distinguishing it from Croley, was Officer Nasr’s abusive outburst. As Officer Nasr rose from the table, he called Mr. Bamidele words meaning “ass-hole” and “motherfucker.” Such derogatory comments were absent in Croley, 759 A.2d at 696 (“[The plaintiffs] account is devoid of comments or mention of gestures by [the defendants] .... ”), but were present in King, 626 A.2d at 883 (noting that the defendant shouted “racial epithets and obscenities”). Finally, both King and the case at hand involved sustained, -violent attacks: Here, the three officers beat and kicked Mr. Bamidele, knocked him to the floor, stomped on him, then held him against a wall while they landed further blows. Cf. id. (“[The defendant] rushed from his car and began punching [the plaintiff] in the head and face....”).
In contrast, Croley involved an assault that was much less extreme, sustained, and violent. In that case, the defendant did not batter or verbally abuse the plaintiff; he pulled the plaintiff to the ground and placed a foot on his chest. Croley, 759 A.2d at 686, 696. The officers’ conduct in this case was much more extreme and prolonged. Indeed, Officers Callahan and Wiedefeld were so engaged in their attack *524 that a uniformed police officer responding to the scene had to physically pull them off Mr. Bamidele. Thus, unlike the defendant’s comparatively mild conduct in Croley, the intensity of the officers’ attack here manifested an intent to injure Mr. Bamidele. Cf. King, 626 A.2d at 884 (holding that defendant’s unprovoked assault demonstrated his intent to engage in “deliberate violence” against the plaintiff).
While the sheer violence involved in the assault on Mr. Bamidele would itself be enough to permit the jury to infer malice, the officers also displayed a reckless disregard for the safety and rights of those around them; by their own admission, the officers consumed alcohol after lawful hours, and two of them violated MPD policies against carrying a weapon while doing so. The officers were impaired to varying degrees; but Officer Callahan was so intoxicated that he could “barely even stand.” Indeed, Officer Callahan’s conduct reflected his impairment: He threw a plate that nearly struck Mrs. Bamidele; engaged in a “wrestling” match with an unidentified man in a crowded restaurant; and then, along with Officer Wiedefeld, refused to break off his assault on Mr. Bamidele, forcing Officer Henderson to physically pull him off Mr. Bamidele. In total, the officers’ actions — consuming alcohol while armed in a crowded restaurant, then engaging in an uncontrolled brawl— evinced their “willful disregard” for the rights of those around them, King, 626 A.2d at 884, including the Bamideles.
In sum, we are satisfied that the evidence was sufficient to submit the Bami-deles’ punitive-damages claim to the jury. Moreover, we agree with the trial court that there is no basis for overturning the jury’s award of punitive damages against Officers Callahan, Nasr, and Wiedefeld.
III. The District’s Liability
The District contends that it is not liable for the damages awarded against the individual officers because (a) the evidence did not show that they acted within the scope of their employment and, in any event, (b) the District is not hable for punitive damages because it neither participated in nor ratified their assault.[5]
A. Compensatory Damages
The District maintains that the evidence failed to establish that the officers were acting within the scope of their employment when they assaulted Mr. Bamidele. “As a general rule, whether an employee is acting within the scope of his employment is a question of fact for the jury. It becomes a question of law for the court, however, if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment.” Brown v. Argenbright Sec., 782 A.2d 752, 757 (D.C.2001) (internal quotation marks omitted). We hold as a matter of law that the officers’ assaultive conduct against the Bami-deles was not within the scope of their employment. See Great A & P Tea Co. v. Aveilhe, 116 A.2d 162, 163-66 (D.C.1955) (reversing jury verdict on ground that there was insufficient evidence to permit conclusion that horseplay between two store employees that injured patron was within scope of employment).
*525 To be within the scope of employment, the tortious activity “must be actuated, at least in part, by a purpose to further the master’s business,” and this “intent or purpose ... excludes from the scope of employment all actions committed solely for [the servant’s] own purposes.” Weinberg v. Johnson, 518 A.2d 985, 990 (D.C.1986) (internal quotation marks omitted) (alteration in original). “However, if the employee acts in part to serve his employer’s interest, the employer will be held liable for the intentional torts of his employee even if prompted partially by personal motives, such as revenge.” Hechinger Co. v. Johnson, 761 A.2d 15, 24 (D.C.2000). The tortious conduct must also be foreseeable to the employer, meaning that it is “ ‘a direct outgrowth of the employee’s instructions or job assignments.’ ” Herbin v. Hoeffel, 886 A.2d 507, 509 (D.C.2005) (quoting Penn Cent. Transp. Co. v. Reddick, 398 A.2d 27, 32 (D.C.1979)).
In their trial testimony, all three officers asserted that, at least initially, they intended to take police action against the unidentified men in response to an assault on Officer Wiedefeld. This testimony may have revealed their motivation to further the District’s interests as to the unidentified men, but it does not demonstrate the same intent vis-a-vis the Bami-deles. “Conduct of a servant [that] is ... too little actuated by a purpose to serve the master” is not within the scope of employment. Restatement (Second) of Agency § 228(2) (1958).[6]
The Bamideles rely upon regulations which say that a police officer is always on duty. These same regulations were cited in District of Columbia v. Coron, 515 A.2d 435 (D.C.1986), where an off-duty police officer had beaten a pedestrian who (with ample justification) had kicked at his car. We did not “interpret such regulations as imposing liability on an employer for the intentional torts of its employee where the employee’s conduct was motivated solely by personal reasons.” Id. at 438. Relying in part on Restatement § 228(2), we overturned a jury verdict which held the District of Columbia liable based on the principles of respondeat superior.
We noted that the officer “was dressed in civilian clothing and driving his own automobile on a purely personal venture at the time of the incident.” Id. at 438. On the other hand, during the beating he had asked, “who the hell do you think you are, kicking my car. I’m a policeman.” Id. at 437. He and his companion displayed their police badges and the companion stated, “we both have guns and we know how to use them.” Id. Nevertheless, we concluded that his “entire behavior during this incident reflected that of an individual bent on personal vengeance for a perceived personal affront.” Id. at 438.
At least where intentional torts are concerned, it is not enough that an employee’s tortious activity occurs while he is on duty, or even that those duties bear some causal relationship to the tort. For example, in Boykin v. District of Columbia, 484 A.2d 560 (D.C.1984), we considered “a sexual assault on a student by an employee of the District of Columbia public schools during the school day and in a school building.” Id. at 561. The employee’s duties required him to be in physical contact with the student. Id. at 562. Nevertheless, the sexual assault “arose out of [the employee’s] assignment only in the sense that [his] walks with the student afforded him *526 the opportunity to pursue his personal adventure.” Id. at 563. It “was in no degree committed to serve the school’s interest, but rather appears to have been done solely for the accomplishment of [the employee’s] independent, malicious, mischievous and selfish purposes.” Id. at 562. We held that the evidence was “insufficient to make the District vicariously liable for [the employee’s] act,” id. at 568, and we upheld the trial court’s decision granting summary judgment to the District of Columbia. Id. at 564.
In this case the officers were off-duty, they were not in uniform, and they were at the restaurant for purely personal reasons. They certainly were not acting within the scope of their employment when they were throwing food at the unidentified men who occupied a nearby table, or when Officer Callahan threw the plate that nearly •struck Mrs. Bamidele. At some point they began to respond to an assault on Officer Wiedefeld, as was their duty. See D.C.Code § 5-115.03 (2008) (making it a misdemeanor for any officer to “neglect making any arrest for an offense ... committed in his presence”). But they did not intend to take police action against Mr. and Mrs. Bamidele, nor did the Bamideles become accidentally entangled in the officers’ scuffle with the unidentified men. Rather, the assault seems to have been precipitated by Mr. Bamidele’s comment to Officer Callahan, which prompted Officer Nasr to call him a pejorative name and to begin beating him. We therefore conclude, as a matter of law, that the officers were not acting within the scope of their employment and that the District of Columbia is not vicariously liable for the awards of compensatory damages.
B. Punitive Damages
While we have concluded that the individual officers may be held liable for punitive damages, we reach a different conclusion as to the District. First, it appears that the Amended Complaint did not seek punitive damages against the District, and the jury was not asked to hold the District liable for punitive damages. When the court instructed on that issue, it made clear that the claim for punitive damages focused on the individual police officers. Although the verdict form differentiated between compensatory damages and punitive damages with respect to each plaintiff and each police officer, it did not ask the jury to assess any damages against the District of Columbia. Instead, the jury was asked to determine whether each individual officer “was acting within the scope of his [or her] employment with the District of Columbia in furtherance of the District of Columbia’s purposes on February 3, 2007.”
The District concedes that all parties anticipated that the District would be vicariously liable for the compensatory damages portion of the awards against the individual officers, given the jury’s conclusion that they acted within the scope of their employment. But those findings were not legally sufficient to make the District vicariously liable for punitive damages. There was no evidence offered at trial to support a finding that the District authorized, participated in, or subsequently ratified the individual officers’ tortious conduct. Without such evidence, the District could not be held liable for punitive damages. See Snow v. Capitol Terrace, Inc., 602 A.2d 121, 127 (D.C.1992); Woodard v. City Stores Co., 334 A.2d 189, 191 (D.C.1975); Darrin v. Capital Transit Co., 90 A.2d 823, 825 (D.C.1952); Restatement (Second) of Torts § 909 (1979). Moreover, the jury was not instructed on these requirements, nor does its verdict reflect such findings. We therefore conclude that the District of Columbia is not liable for *527 the awards of punitive damages.[7]
IV. Conclusion
For the foregoing reasons, we reverse the judgment against the District of Columbia. We affirm the judgments against the individual officers. But as we noted above, the trial court’s judgment order does not fully reflect the jury’s verdict. The order does not itemize the damages awarded against each individual officer, distinguishing between the compensatory damages and the punitive damages awarded against each individual officer. Thus, we remand the case with instructions to amend and reenter the order.

So ordered.

. It is not clear from the record who threw this punch. At trial, Mr. Bamidele testified that the assailant was a taller man, approximately 6'3" in height. Mrs. Bamidele also declared that a taller man threw the first punch. But the officers asserted that there was no fourth person with them when the assault began. All three officers maintained that a fourth officer, Officer Morley, was with them when they first arrived at the restaurant. Officer Callahan described Officer Morley as being roughly 6'4" tall. But he and Officer *520 Wiedefeld both testified that Officer Morley left the restaurant sometime before the assault began.

. Officer Nasr apparently made these comments in Arabic. Mr. Bamidele testified that Officer Nasr literally said, ‘‘[ajscidia moota,” which he translated into "ass-hole, motherfucker.” Mr. Bamidele stated that he learned Arabic in his "country of origin — Nigeria.”

. Specifically, tire jury awarded Mr. Bamidele $25,000 in compensatory damages and $35,000 in punitive damages against Officer Callahan; $15,000 in compensatory damages and $30,000 in punitive damages against Officer Wiedefeld; and $20,000 in compensatory damages and $35,000 in punitive damages against Officer Nasr. The jury awarded Mrs. Bamidele $10,000 in compensatory damages and $10,000 in punitive damages against Officer Callahan, but made no award against Officers Wiedefeld and Nasr. The jury also awarded the Bamideles $23,000 against the Szechuan Gallery restaurant. The restaurant has not appealed from this judgment.

. While this injury was less severe than the injuries Mr. Bamidele suffered, the jury appears to have taken this fact into account-awarding her a substantially lower sum ($10,-000) than Mr. Bamidele received ($60,000).

. Before trial, tire District moved to dismiss the Bamideles' complaint for failure to comply with D.C.Code § 12-309, which requires plaintiffs who intend to sue the District to give the Mayor's office written notice of their claims within six months of their injury. The trial court denied the District’s motion, and the District argues on appeal that this was error. In light of our conclusion that the District is not liable for either compensatory or punitive damages, we do not discuss the issue of notice.

. We have long endorsed the Second Restatement’s approach. See, e.g., Murphy v. Army Distaff Found., 458 A.2d 61, 63 n. 2 (D.C.1983); Johnson v. Weinberg, 434 A.2d 404, 408 (D.C.1981).

. We reject the Bamideles’ assertion that it is too late for the District to question its liability for punitive damages because it did not challenge the form of the judgment. The judgment did not impose any liability on the Dis-tact, ordering only that judgment be entered against Officers Callahan, Wiedefeld, and Nasr, and the Szechuan Gallery Restaurant in the total amount of $203,000.