*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 16-CV-1211 & 16-CV-1212

WALTER BLAIR, II, APPELLANT,

v.

FILED 08/2/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

DISTRICT OF COLUMBIA & THADDEUS MODLIN, JR., APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(CAB-4815-12 & CAB-3271-14)

(Hon. Jeanette Jackson Clark, Trial Judge)

(Argued February 28, 2018                    Decided August 2, 2018)

*Jack A. Gold*, with whom *Ronald A. Karp* and *Zachary King* were on the brief, for appellant.

*Lucy E. Pittman*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General at the time the brief was filed, and *Loren L. AliKhan*, Deputy Solicitor General at the time the brief was filed, were on the brief, for appellee District of Columbia.

*Anthony Graham*, *Sr*., for appellee Thaddeus Modlin, Jr.

Before FISHER and THOMPSON, *Associate Judges*, and FERREN, *Senior Judge*.

FERREN, *Senior Judge*: This case arises from a lawsuit against the District of Columbia ("District") and an off-duty Metropolitan Police Department ("MPD")

officer claiming assaultive and negligent conduct that injured the plaintiff-appellant during a melee. The officer, Thaddeus Modlin, allegedly kicked Walter Blair II several times in the head outside a nightclub in June 2011, causing him severe personal injuries. Blair appeals the trial court's order granting summary judgment for both the District and Officer Modlin. We affirm the trial court's grant of summary judgment for Officer Modlin. We also affirm summary judgment for the District on Blair's claim alleging negligence in hiring, training, and supervising Modlin. We discern error, however, in the trial court's grant of summary judgment for the District on Blair's claim for assault and battery based on *respondeat superior*. To resolve that issue, we must reverse and remand the case for further proceedings.

## I.  Background

### A.  *The Incident*

Blair's complaint alleges that in the early hours of June 10, 2011, he left the Lotus Lounge nightclub at 1420 K Street, N.W., as it was closing. After he left, a quarrel broke out near him in front of the club. As the fight began, Blair was surrounded by a group of (what he believed to be) Lotus Lounge bouncers clothed

in black. Some of these individuals, he alleged, "were D.C. police officers." During the altercation, Blair fell to the ground. As he lay there, the bouncers struck him in the eye, head, face, shoulders, and chest, causing Blair eventually to lose his right eye. Officer Modlin, one of the officers in the group that surrounded Blair, later pled guilty to one count of simple assault, as well as one count of possession of a prohibited weapon, for his role in the affray.

Pretrial discovery revealed Officer Modlin's understanding of the events leading up to the incident. On June 10, 2011, according to Modlin's deposition, he had gone to the Lotus Lounge to meet a fellow officer, Kenneth McRavin. Both officers were in civilian clothing. When the club closed at approximately 2:30 a.m., all patrons departed and began standing outside. Officer Modlin was part of one cluster of patrons, along with officers McRavin and Keith Goins, while Blair and his friends made up another group.

While outside the nightclub, Blair and Officer Modlin got into a verbal dispute, although it is unclear how their conversation began. During their exchange, according to Modlin's deposition, he identified himself as a police officer, saying, "Hold on, Brother; we're the police." He then displayed his badge "that was sitting on [his] hip," and instructed Blair to calm down and leave the

premises.[1]  Officer Modlin gave these instructions more than once, he added, and "everyone out there knew we were . . . the police."

While Officer Modlin was telling Blair to leave, there was (according to a Blair interrogatory response) "an altercation developing between an acquaintance of [Blair] and a Lotus Lounge bouncer and/or police officer."[2]  As the altercation continued to develop, said Modlin, "Blair leap[ed] across [Officer] Goins' shoulder and punche[d] Officer McRavin in the face."  Officer Modlin was then "struck in the back of the head by one of Mr. Blair's friends, and that's when the melee occurred."  "After [Officer Modlin] recovered from being struck in the head," the attacker attempted to strike him again but was stopped by a bouncer.  Modlin explained that, "[f]rom there, I started looking around to try to find Officer McRavin and Officer Goins" and saw Blair on top of a nightclub bouncer.  Officer

---

[1]  Officer Modlin was also carrying his service revolver but did not display it at any time during the incident.

[2]  Detective Robert Saunders testified on deposition that an investigation had ascertained that the altercation had begun because "Officer Lampkin was trying to get out into the traffic.  Some girls were blocking the alley.  [Officer Lampkin] couldn't get out.  An argument ensued and there came a time when Officer McRavin intervened.  And I'm told that he may have identified himself to the girls, the disorderly girls that's trying to get at Lampkin as being a police officer."  Officer Modlin also testified about the incident involving a female patron.  He explained, "[W]e're still trying to get the girl to leave, she's still jumping in our way, making threats."

Modlin "[a]t that point . . . went over, . . . used [his] foot and . . . tried to . . . kick the guy off of the . . . bouncer, like three — three times." According to Modlin, Blair "eventually escaped my grip and started running eastbound on K Street, towards 14th, as the other police units were pulling up." The incident was recorded on the Lotus Lounge "surveillance equipment."

Continuing on deposition, Officer Modlin explained that, as a police officer, he was always on duty, even when he was not formally scheduled. While the tension was beginning to brew, according to Modlin, he did not attempt to make an arrest "[b]ecause that would have been like sticking a stick into a bee hive, knowing that all these guys out there are drunk; as soon as we put our hands on them . . . we're going [to] get into a fight." He clarified that "when Mr. Blair began — and his compatriots started making threats, no, we didn't immediately go hands-on and try to arrest one of them or detain them, because . . . all of them were already hostile, and they were all drunk, so to avoid a fight," Modlin and the other officers attempted "verbally" to get them to comply. Modlin further explained that "it wasn't feasible," "it was total chaos," and "[t]o sit there and try to detain one [of] them would have meant that we would have subjected ourselves to possibly being assaulted while trying to hold him there, as we didn't have handcuffs." In essence, Modlin elucidated, "the altercation was thrust upon us by Mr. Blair," and

"the only thing we had was survival instincts to, one, protect Officer Goins and Officer McRavin and, secondarily, to protect the bouncers who came out to assist us with the other 14 individuals that decided they wanted to jump on us too."

### B. Procedural History

On June 5, 2012, less than a year after the incident, Blair filed his first lawsuit (*Blair I*) seeking damages from both the District and the Lotus Lounge. As to the District, he sought damages based on: (1) vicarious (*respondeat superior*) liability for negligence, alleging failure "to take reasonable measures" to protect Lotus Lounge patrons, including Blair; (2) vicarious liability for assault and battery by "D.C. police officers," who allegedly punched and kicked Blair "within the scope of their employment"; and (3) negligent hiring, training, and supervision of District police officers. Blair did not name Officer Modlin as a defendant in this complaint. On December 11, 2012, the trial court granted the District's motion to dismiss Blair's complaint pursuant to Super. Ct. Civ. R. 12 (b)(6) for failure to state a claim.[3] On appeal, we reversed and remanded *Blair I*, reinstating all counts

---

[3] *Blair v. Lotus Lounge*, No. 13-CV-779, Mem. Op. & J. at 2, 7 (D.C. Sept. 30, 2014) (trial court dismissed all three counts against the District, finding Blair had failed to allege sufficient facts showing that District police officers were acting within the scope of their employment at the time of the assault).

pled against the District.[4]

While *Blair I* was pending on appeal, Blair filed a second complaint (*Blair II*) on May 29, 2014, just shy of three years after the melee, this time seeking damages from Officer Modlin on two grounds: negligence and gross negligence.[5] Specifically, Blair alleged that "[i]nstead of acting to [defuse] the situation and keep individuals from harm, [Officer] Modlin joined the melee which was taking place in front of Lotus Lounge." The injuries he suffered, Blair continued, were caused by Officer Modlin's negligence, because the officer "had a duty to use reasonable care to protect individuals from harm," "had a duty to take reasonable steps to restrain [Blair]," and "had a duty to act reasonably in the use of force." According to the complaint, Officer Modlin also "negligently failed to stop the altercation or make any attempt to calm the situation," "negligently engaged in conduct which created a grave risk of serious bodily injury to [Blair]," failed "to act as a reasonably prudent police officer would have acted in such a situation,"

---

[4] *See id.* (remanding all three counts in the complaint against the District, concluding that "[f]urther development of the facts" was necessary to determine whether MPD officers were acting within the scope of their employment).

[5] The complaint also sought damages from Lotus Lounge bouncer Timothy Brown on counts not before us on this appeal.

and failed "to follow normal and accepted practices and procedures."[6]

On February 25, 2015, Officer Modlin filed a motion for summary judgment in *Blair II*, seeking dismissal of both negligence claims against him as a matter of law. He argued that, pursuant to the public duty doctrine, he was "shielded from liability because he was performing a public service." In opposing Officer Modlin's motion, Blair replied that the public duty doctrine was inapplicable, as he was "not simply alleging that [Officer] Modlin failed to protect him from harm caused by a third party." Rather, stressed Blair, Officer Modlin was "directly responsible for negligently injuring [Blair], *i.e.*, joining a melee in front of the Lotus Lounge nightclub and kicking [Blair]." Such conduct, he argued, fell outside protection of the public duty doctrine.

In a written order on March 17, 2015, the trial court granted summary judgment for Officer Modlin in *Blair II*, concluding that, as a matter of law based

---

[6] Blair's allegations against Officer Modlin for gross negligence are almost identical to those for negligence. In paragraphs 25 through 27 of the complaint relating to gross negligence, Blair contends that his injuries "were caused by the recklessness" of Officer Modlin because Officer Modlin had "acted with reckless disregard and created a grave risk of serious bodily injury" to Blair. Throughout the pleadings, neither party nor the trial court distinguishes between the counts for negligence and gross negligence. Accordingly, our references to Blair's negligence claims against Officer Modlin hereinafter encompass both the count for negligence and the one for gross negligence.

on the pleadings and discovery, neither of Blair's claims could proceed for two reasons. First, according to this court's *Woods* decision,[7] Officer Modlin owed no duty "to provide general services to the public," meaning that the "public duty doctrine" — absent an exception — protected Modlin (as well as his District employer) from liability.[8] The trial court then rejected the only recognized exception to the doctrine, concluding it was "clear from the record that no special duty was owed to Plaintiff," for he was neither a member of "a particular class of persons" expressly protected by statute against harm, nor was he in "direct or continuing contact" with the District government with "justifiable reliance" on government protection.

Second, even without regard to the doctrinal bar, the trial court found *sua sponte* that, based on his proffered facts, plaintiff Blair had "not raised any negligence cause of action against Defendant Modlin"; rather, he was attempting, unpersuasively, to convert an obvious assault into a claim for negligence, in order to avoid the expired one-year statute of limitations for intentional torts. The court stressed that, in relying on Officer Modlin's criminal conviction for simple assault

---

[7] *Woods v. District of Columbia*, 63 A.3d 551 (D.C. 2013).

[8] *Id.* at 553 (noting that officers owe no duty to provide general services to the public).

to support his claims based on negligence, plaintiff Blair was manifestly premising his case on "intentional conduct, not negligent conduct" and thus was barred by the limitation period from going forward.

On July 1, 2015, almost four months after granting Modlin's motion for summary judgment, the trial court consolidated what was left of *Blair II* (Blair's allegations against Lotus Lounge bouncer, Timothy Brown) with *Blair I* (Blair's allegations against the District and Lotus Lounge).

On December 1, 2015, the District filed a motion in *Blair I* to dismiss all claims against it premised on Officer Modlin's conduct, arguing that they were barred by *res judicata* (claim preclusion) based on the trial court's March 17, 2015, summary judgment for the District in *Blair II*. Basically the District was contending that if Modlin's conduct did not justify his own liability, then *a fortiori* his conduct could not justify the District's vicarious (derivative) liability. The trial court agreed and granted the District's dismissal motion on January 6, 2016, ruling that Blair had "not stated a cause of action against [the District] because the principle of res judicata bars his claims." Blair and the District agreed at the time, however, that the trial court's preclusion ruling in *Blair I* was unclear as to whether it extended to all its negligence counts, as well as to the count for assault and

battery. As a result, the trial court granted the District leave to file a motion for summary judgment on claims it deemed outstanding, an invitation the District accepted by addressing each of Blair's claims on the merits, forgoing reliance on *res judicata*.

On April 25, 2016, the District filed a motion for summary judgment in *Blair I* alleging that, as a matter of law, it could not be held liable for injuries that Blair had sustained as a result of Officer Modlin's conduct because Modlin was not acting within the scope of his employment. Shortly thereafter on June 10, 2016, the trial court heard argument and orally granted summary judgment for the District on Blair's two claims based on vicarious liability (*respondeat superior*), as well as on his claim for negligent hiring, training, and supervision.

The trial court implicitly withdrew its January 6, 2016, ruling that dismissed *Blair I* based on *res judicata*. As to vicarious liability for both negligence and assault and battery, the trial court concluded that

> reasonable jurors could not find that participating in an altercation would have been part of his duties/responsibilities. Kicking the individual with his shoe several times on the ground to the point where the plaintiff has lost sight would not have been a part of his

duties and responsibilities.

Thus, in rejecting Blair's theory that Officer Modlin had been acting, at least in part, to serve the District's interests, the trial court observed that criminal acts are the antithesis of police work, and so it was not "foreseeable/expectable" that Officer Modlin would use excessive force. In sum, Officer Modlin's actions did not fall within the scope of his employment.

On the negligent hiring, training, and supervision claim, the trial court was dissatisfied with Blair's proffered expert on the national standard of care for "hiring, training, or retaining the police officer." The court elaborated:

> With respect to training, what is the specific training at issue? What is the training that is required by a national standard and then how the defendant breached that particular standard? Did they require training on crowd control once a year and the District did not have this individual trained once a year? Did they have training on excessive force and what is the national standard for police officers on the issue of excessive force, and the District did not have that training in place for this particular officer? . . . And with the retention and supervision, what would be the . . . national standard to retain and to supervise an individual in this particular officer's position? The allegations by the plaintiff that he had problems on his job; that he engaged in other misconduct. Well, but what's the standard? How many

> infractions does it take? What's the nature of the infractions in terms of police departments across the country? That has not been articulated in this opposition filed by the plaintiff.

Based on the evidence of record, the trial court found that Blair would be unable to prove negligent hiring, training, and supervision "mainly because he hasn't established what a national standard [of care] is." As a jury is not permitted to "engage in guesswork," said the court, the District was entitled to judgment as a matter of law.

## II. The Issues

Blair asserts four grounds for reversal:

1. The trial court erred in ruling that the "public duty doctrine" barred recovery against Officer Modlin (*Blair II*) for actions outside the Lotus Lounge.

2. The trial court further erred in concluding that Blair's claims against Officer Modlin (*Blair II*), characterized as negligence actions, were actually intentional tort actions barred by the one-year statute of limitations.

3.  The trial court also erred in ruling as a matter of law (*Blair I*) that Officer Modlin was acting outside the scope of his employment at the time of the alleged assault on Blair, and thus that the District could not be held vicariously liable for his actions under the *respondeat superior* theory of recovery.

4.  Finally, the trial court abused its discretion (*Blair I*) by requiring Blair to present expert testimony explaining the national standard of care as the predicate essential to proving his claim that the District had negligently hired, trained, and supervised Officer Modlin.

## III.  Standard of Review for Summary Judgment

"The question whether summary judgment was properly granted is one of law, and we review *de novo*."[9]  Summary judgment should be granted only if a party demonstrates that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[9]  *Johnson v. District of Columbia*, 144 A.3d 1120, 1125 (D.C. 2016) (quoting *William J. Davis, Inc. v. The Tuxedo LLC*, 124 A.3d 612, 617 (D.C. 2015)).

judgment as a matter of law."[10] In independently assessing the record, "[w]e view the facts in the light most favorable to the non-moving party to determine '(1) whether any genuine issue of material fact exists, and (2) whether appellees are entitled to judgment as a matter of law.'"[11]

While the moving party bears the burden of demonstrating that there is no genuine issue of material fact, "conclusory allegations by the nonmoving party are insufficient to establish a genuine issue of material fact or to defeat the entry of summary judgment."[12] Any doubt, however, "about the existence of a factual dispute must be resolved in favor of the non-moving party."[13]

## IV. Alternate Rulings in *Blair II*

In *Blair II* the trial court issued two alternate rulings. The court (1) applied

---

[10] *Steele v. Salb*, 93 A.3d 1277, 1281 (D.C. 2014) (quoting *Franco v. District of Columbia*, 39 A.3d 890, 894 (D.C. 2012)).

[11] *Parcel One Phase One Assocs., L.L.P. v. Museum Square Tenants Ass'n*, 146 A.3d 394, 398-99 (D.C. 2016) (quoting *West End Tenants Ass'n v. George Wash. Univ.*, 640 A.2d 718, 725 (D.C. 1994)).

[12] *Johnson*, 144 A.3d at 1125 (quoting *Hamilton v. Howard Univ.*, 960 A.2d 308, 313 (D.C. 2008)).

[13] *Klock v. Miller & Long Co.*, 763 A.2d 1147, 1150 (D.C. 2000).

the "public duty doctrine" to immunize Officer Modlin from liability for alleged simple and gross negligence that resulted in Blair's injuries outside the Lotus Lounge, and (2) rejected *sua sponte* Blair's two "negligence" claims against Modlin for failure to file suit within the one-year limitation period applicable to "assault and battery." As explained below in part V., we sustain the trial court's statute of limitations ruling that bars all recovery against Officer Modlin. Thus, we need not reach the court's initial, merits ruling in *Blair II* that interposed the "public duty doctrine" to bar recovery against Officer Modlin for his allegedly negligent conduct against Blair.

Moreover, the District has not relied on the public duty doctrine in *Blair I* even as a fallback argument, for good reason: Our limitations ruling in *Blair II* precludes Blair's vicarious liability claims against the District based on the alleged negligence of Officer Modlin, and the public duty doctrine only permits recovery for negligent breach of a duty of care — specifically, breach of a duty to protect[14]

---

[14] *See Taylor v. District of Columbia*, 776 A.2d 1208, 1214 (D.C. 2001) (in wrongful death and survival action alleging District's negligent "failure to protect" police informant murdered by "known dangerous criminal," court sustained summary judgment for District, holding plaintiff had failed to proffer evidence sufficient to raise genuine issue that decedent had established the "special relationship" with District police detectives required for recovery under public duty doctrine); *Powell v. District of Columbia*, 602 A.2d 1123, 1126 (D.C. 1992) ("This court has adopted the public duty doctrine to limit the District's liability in

(continued…)

— not for an intentional tort such as assault and battery, the only claim remaining in *Blair I.*

## V. Statute of Limitations

We begin with the trial court's dispositive ruling in *Blair II.* Blair disputes the trial court's *sua sponte* ruling that his claims against Officer Modlin for gross and simple negligence were not sufficiently distinct from assaultive conduct to fend off dismissal under the one-year statute of limitations for intentional torts. We cannot agree with Blair; the court ruled correctly.

Blair brought his simple negligence claim against Officer Modlin based on Modlin's actions leading up to, as well as during, his civil (and criminal) assault on Blair. In paragraphs 17 through 24 of his complaint Blair alleges that Officer Modlin failed "to [defuse] the situation" outside the Lotus Lounge, failed "to act as a reasonably prudent police officer would have acted," failed "to follow normal and accepted practices and procedures," and failed to "respond [] properly to the situation as it existed." Blair's gross negligence allegations in paragraph 26 focus

---

(…continued)

negligence cases where sovereign immunity is not a bar to suit."); *id.* at 1133 ("There is no allegation in the present case that the District owed Ms. Powell a duty to rescue or protect her from some pre-existing peril.") (Schwelb, J. concurring).

on the officer's use of force, while stressing that before Officer Modlin had exerted that force, he had failed to "take reasonable measures" to protect Blair and other patrons, as well as to "take reasonable steps to restrain" Blair — *i.e.*, to effectuate his arrest — rather than join the melee.

The question presented is whether these allegations of negligence, premised on asserted violations of police regulations as well as the common law, plead claims, occurring prior to any assault, that the trial court should have entertained on this record, unaffected by the one-year statutory limitation on civil actions for assault and battery.

Confusion about the relationship between intentional torts and negligence in police brutality suits is not new to this court.[15] We have confirmed that "[a]n individual who has been injured by a District police officer may sue under one or

---

[15]    *Holder v. District of Columbia*, 700 A.2d 738, 742 (D.C. 1997) ("Although we have at times remarked on the similarities and differences of these causes of action [battery and negligence], we have never precisely delineated them from one another. . . .  That we have previously remarked upon the similarities of these causes of action is unsurprising because they all fundamentally involve an inquiry into the reasonableness of the police officer's actions."); *see District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003) (noting that prior decisions have "recognized the perhaps somewhat confused and overlapping legal principles relating to police use of force") (quoting *Holder*, 700 A.2d at 742) (internal quotation marks omitted).

more common law theories of legal liability such as assault and battery or negligence."[16] But "in order to go to the jury, [these claims] must be separate and distinct from each other, even though related, and each of the two counts must be supported by the necessary evidence.[17] We have also emphasized that these causes of action are "mutually exclusive grounds for liability."[18]

In our *Chinn* decision, we elaborated upon this "separate and distinct" requirement. First, we observed that when a police officer's privileged use of force "escalates in an unbroken manner into excessive force, the cause of action is a battery alone, with the privilege having ended at the point where excessive force began."[19] In other words, as a general rule, evidence reflecting an unbroken escalation from permissive to excessive force preempts a lesser negligence claim based on the same evidence. As we stressed in *Chinn*, "a plaintiff cannot seek to recover by 'dressing up the substance' of one claim, here assault, in the 'garments'

---

[16] *Chinn*, 839 A.2d at 705.

[17] *Id.* at 707.

[18] *Id.* at 706 (citation omitted).

[19] *Id.* at 707; *see also Holder*, 700 A.2d at 742 ("[E]xcessive force is a term of art denoting an act of assault or battery by law enforcement officials committed in the course of their duties") (quoting *District of Columbia v. Tinker*, 691 A.2d 57, 64 (D.C. 1997)) (internal quotation marks omitted).

of another, here negligence."[20]   Indeed, to instruct the jury "on a separate and distinct tort of negligence" in such circumstances would be not only "doctrinally unsound," but also "a potential source of jury confusion."[21]

This general rule, however, is premised on the parties' common understanding of what happened.  We acknowledged in *Chinn* the possibility that the evidence in some police brutality cases might be interpreted to tell two, fundamentally different stories.  "[I]n certain circumstances the events surrounding the application of excessive force may lend themselves to a theory of negligence . . . involving an independent breach of a standard of care . . . apart from the intentional tort of battery and the defense of privilege."[22]  We cautioned, however, that each of our cases which had "upheld submitting both negligence and battery counts to a jury have common characteristics."[23]  Of the four characteristics we

---

[20]  *Chinn*, 839 A.2d at 708 (quoting *Sabir v. District of Columbia*, 755 A.2d 449, 452 (D.C. 2000)).

[21]  *Id.* at 707.  We added that a separate instruction on negligence applicable to the same evidence would "raise[] the risk that even where no excessive force is used, the jury will conclude that some undefined negligence was present for which relief of some sort is justified."  *Id.*

[22]  *Id.*

[23]  *Id.* at 710.  We described four common characteristics of civil actions against the police in which we had permitted submission of both negligence and

(continued…)

specified, the one required to justify Blair's negligence claims here is the third: there must be evidence that supports two, "alternate scenarios" explaining what happened — a scenario that evidenced intentional action (Officer Modlin's alleged battery upon Blair), and a second scenario that manifested "a distinct act of negligence" by Officer Modlin based on "a misperception of fact" that undermined any intent to harm Blair but "may have played a part" in Modlin's decision to act with the challenged force.[24]

The civil actions on which we relied in *Chinn* to justify dual instructions, for assault and battery and for negligence, were cases involving police shootings in which the victim and the officer told different stories. For example, in each the plaintiff claimed that the officer had shot him (or plaintiff's decedent) while the

---

(…continued)

assault and battery claims to the jury: "[1] Each involves the use of deadly force. [2] Each invokes a police regulation establishing a standard of care with respect thereto that is arguably distinct from the excessive force standard. [3] *Each involves alternate scenarios in at least one of which a distinct act of negligence, a misperception of fact, may have played a part in the decision to fire.* [4] Each involves a negligent act that precedes the application of the relevant force of resort to firearms, i.e., prior to the pulling of the trigger." *Id.* at 710-11 (emphasis added). We have not said that in every case all four characteristics are required to justify dual instructions for assault and battery (excessive force) and negligence. Moreover, in this case we need not consider any but the third characteristic.

[24] *Id.* at 711.

victim was standing still, hands empty. To the contrary, in each case the officer testified that he had believed the victim had a gun and "turn[ed] around to face" the officer,[25] or had a gun and disobeyed an order "to freeze,"[26] or "had a knife" and came at the officer.[27] And thus in each case, the officer allegedly shot in self-defense — at worst negligently, in violation of police firearm regulations.

We do not have "alternate scenarios" here. Blair's allegations of negligence leading up to Officer Modlin's civil (and criminal) assault on him reflect legal theories separate and distinct from assault and battery, premised on violation of police regulations[28] and the common law duty of reasonable care.[29] But Blair's

---

[25] *District of Columbia v. White*, 442 A.2d 159, 162 (D.C. 1982).

[26] *Etheredge v. District of Columbia*, 635 A.2d 908, 914 (D.C. 1993).

[27] *District of Columbia v. Evans*, 644 A.2d 1008, 1020-21 (D.C. 1994).

[28] *White*, 442 A.2d at 163 ("[T]he police regulation on an officer's safe use of firearms established a duty owed decedent, a breach of which would constitute evidence of negligence") (footnotes omitted); *id.* (["V]iolation of an ordinance intended to promote safety can give rise to a negligence action.") (citation and internal quotation marks omitted); *see, e.g.*, 6-A DCMR § 200.6 (2018) ("On the occurrence of a disturbance it is the duty of the police to restore order and disperse the crowd by moderate efforts or persuasion, if possible. If those efforts fail, [reasonable] force shall be used and the principals arrested.").

[29] *Woods*, 63 A.3d at 553 ("[T]he elements of a cause of action for negligence are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately

(continued…)

allegations do not rely on a factual scenario different from the one evidencing the officer's escalating conduct, beginning with his verbal dispute with Blair outside the Lotus Lounge and ending with assault and battery. In fact, Blair claims no injury traceable to Officer Modlin's "negligent" actions that were "separate and distinct"[30] from Modlin's assaultive conduct. He does not dispute that all the evidence is "intertwined with and dependent on" the melee.[31] Thus "[a]ny 'negligence' was inherent in the battery itself."[32]

We summarized in *Chinn* that "if, in a case involving the intentional use of force by police officers, a negligence count is to be submitted to a jury, that negligence must be [1] distinctly pled[,] [2] based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force

---

(…continued)
caused by the breach.") (quoting *Taylor*, 776 A.2d at 1214).

[30] *Chinn*, 839 A.2d at 707-08.

[31] *Stewart-Veal v. District of Columbia*, 896 A.2d 232, 235 (D.C. 2006) (upholding trial court's dismissal of negligence count because "it [wa]s not separate and distinct from the false arrest claim").

[32] *Chinn*, 839 A.2d at 711.

itself[,] and [3] violative of a distinct standard of care."[33] Blair has failed to meet the second, alternate factual scenario requirement. Thus, he has pled no separate, legally cognizable claim of negligence against Officer Modlin individually.[34] In sum, the evidence supporting Blair's negligence counts against the officer — mirroring his assault and battery count against the District based on *respondeat superior* — supports only an assault and battery claim, preempts a negligence claim, and thus runs afoul of the one-year statute of limitations applicable to intentional torts. [35]

---

[33] *Id.* at 708, 711 ("In other words, a plaintiff cannot seek to recover by 'dressing up the substance' of one claim, here assault, in the 'garments' of another, here negligence.") (quoting *Sabir*, 755 A.2d at 452).

[34] *See id.* at 711 ("The crux of Chinn's claim is that the officers deliberately inflicted excessive force upon him, and the evidence he presented at trial was that officers continuously assaulted him without provocation. Chinn did not argue that the officers mistakenly or negligently thought Chinn was armed; Chinn did not allege that the officers misperceived him as a threat.").

[35] The federal courts in this jurisdiction also have applied the alternate scenario approach to permitting dual jury instructions, for negligence and assault and battery, in police brutality lawsuits. *See Moore v. District of Columbia*, 79 F. Supp. 3d 121, 147 (D.D.C. 2015) (within jury's purview to determine whether excessive force negligence claim was sufficiently pled given "disputed versions of the event," where "plaintiffs allege[d] that the defendant MPD officers exchanged signals as part of [an officer's] coordinated plan to tackle, intentionally, both plaintiffs," compared to defendant's assertion that plaintiff "initiated contact with" officers) (internal quotation marks omitted); *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 30-31 (D.D.C. 2011) (plaintiff's "evidence, viewed in a light most favorable to him, can support [two] scenarios—that is, that [the officer] either intentionally applied the handcuffs tightly and deliberately failed to lock the

(continued…)

## VI.  Vicarious Liability

Although we affirm summary judgment for Officer Modlin individually on Blair's negligence claims against him in *Blair II*, that judgment does not affect Blair's vicarious liability claim against the District based on the officer's acknowledged (criminal) assault and battery on Blair, as that assault and battery claim was filed against the District of Columbia (but not against Officer Modlin) within the one-year limitation period for intentional torts.

The District maintains, nonetheless, that summary judgment was properly granted in *Blair I* because the undisputed facts show, as a matter of law, that Officer Modlin was not acting within the scope of his employment when he criminally assaulted Blair.  In Blair's complaint against the District, he alleges two theories of vicarious liability:  assault and battery and negligence.  We address

---

(…continued)
handcuffs, or that he recklessly believed that he had properly applied the handcuffs.  In this sense, [plaintiff's] claim is similar to other cases in which plaintiffs have been allowed to submit both [negligent and assault and battery] theories of liability to a jury."); *Austin v. District of Columbia*, No. 05-CV-2219, 2007 WL 1404444, at *5 (D.D.C. May 11, 2007) (evidence established "conflicting accounts of the facts" — one where plaintiff believed the officer "struck him without provocation" and the other where the officer believed plaintiff was swinging at him — which indicates "some similarity between this suit and the line of cases in which both battery and [excessive force] negligence claims have properly been submitted to the jury").

only Blair's assault and battery claim because, absent the negligence claimed against Officer Modlin (as we rejected above), there is no employee negligence for which the District can be held vicariously liable.

"*Respondeat superior* is a doctrine of vicarious liability" that imposes liability on employers for tortious and negligent "acts of [their] employees committed within the scope of their employment."[36] Generally, "whether an employee is acting within the scope of his employment is a question of fact for the jury."[37] It becomes a question of law, however, "if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment."[38] Thus, the precise question before us is whether Officer

---

[36] *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 427 (D.C. 2006) (quoting *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 29 (D.C. 1979)); *see also Holder*, 700 A.2d at 741-42 (noting that *respondeat superior* applies to both negligent and intentional torts of Metropolitan Police Department officers who are acting within the scope of their employment).

[37] *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 757 (D.C. 2001).

[38] *Id.* (quoting *Boykin v. District of Columbia*, 484 A.2d 560, 562 (D.C. 1984)); *accord Schecter*, 892 A.2d at 428 ("Further, when all reasonable triers of fact must conclude that the servant's act was independent of the master's business, *and solely for the servant's personal benefit*, then the issue becomes a question of law, and the master is entitled to judgment.") (emphasis in original) (internal citation and quotation marks omitted); *Penn Cent. Transp. Co.*, 398 A.2d at 29 ("The words 'scope of employment' have no precise legal meaning and thus, the determination of scope of employment is dependent upon the facts and

(continued…)

Modlin's allegedly tortious conduct outside the Lotus Lounge was wholly outside the scope of his employment, or instead was committed — at least in part — within that scope. Contrary to the trial court, we conclude as a matter of law that a reasonable jury could find that Officer Modlin's actions came within the scope of his employment.

"To be within the scope of employment, the tortious activity 'must be actuated, at least in part, by a purpose to further the master's business,' and this 'intent or purpose excludes from the scope of employment all actions committed solely for the servant's own purposes.'"[39] Thus, to come within that scope, an employee's actions need not be wholly in furtherance of the employer's business. Indeed, "if the employee acts in part to serve his employer's interest, the employer will be held liable for the intentional torts of his employee even if prompted partially by personal motives, such as revenge."[40] While the conduct need only be

---

(…continued)
circumstances of each case.").

[39] *District of Columbia v. Bamidele*, 103 A.3d 516, 525 (D.C. 2014) (quoting *Weinberg v. Johnson*, 518 A.2d 985, 990 (D.C. 1986)) (brackets and alterations omitted).

[40] *Id.* (quoting *Hechinger Co. v. Johnson*, 761 A.2d 15, 24 (D.C. 2000)); *see also Weinberg*, 518 A.2d at 991 ("As the law has evolved, the intent or purpose criterion has become broad enough to embrace an intentional tort arising out of any

(continued…)

in part to serve the employer's interests, the employee's "tortious conduct must . . . be foreseeable to the employer, meaning that it is 'a direct outgrowth of the employee's instructions or job assignments.'"[41]

The District relies primarily on two judicial decisions to convince us that this case, too, presents a situation similar to those in which assaults committed by off-duty police officers were outside the scope of each officer's employment. In *District of Columbia v. Coron*,[42] the victim of an assault by two off-duty police officers based liability for his injuries upon regulations that "require officers always to be 'on duty' and to carry their service revolvers, badges, and identification cards" — assertedly evidence sufficient to show that each officer's actions were within the scope of his employment.[43] In rejecting this argument, we

_____

(…continued)
dispute that 'was originally undertaken on the employer's behalf.'") (quoting *Int'l Distrib. Corp. v. Am. Dist. Tel. Co.*, 569 F.2d 136, 139 (D.C. Cir. 1977)).

[41] *Bamidele*, 103 A.3d at 525 (quoting *Herbin v. Hoeffel*, 886 A.2d 507, 509 (D.C. 2005)).

[42] 515 A.2d 435 (D.C. 1986).

[43] *Id.* at 438. In *Coron*, a pedestrian kicked a police officer's personal automobile after the officer almost struck the pedestrian in a crosswalk. *Id.* at 436-37. The officer and his friend, a fellow officer, then left the car and began repeatedly punching the pedestrian. *Id.* at 437. While assaulting the pedestrian, the officer exclaimed, "who the hell do you think you are, kicking my car. I'm a
(continued…)

explained that a scope of employment defined exclusively by reference to such regulations would be too broad.

For example, we do not "interpret such regulations as imposing liability on an employer for the intentional torts of its employee" when, as we held in *Coron*, "the employee's conduct was motivated solely by personal reasons."[44] Otherwise, we said, the District would be vulnerable to liability "regardless of the nature of an officer's conduct."[45] Accordingly, courts assess, as best they can, the facts relevant to discerning the motivation underlying an officer's conduct. We began in *Coron*, for example, with evidence that the allegedly offending officer[46] was "dressed in civilian clothing and driving his own automobile on a purely personal venture at the time of the incident."[47] Although the officers had displayed their badges after

---

(…continued)
policeman." *Id.* As the officers were leaving, the pedestrian questioned whether "they were really police officers." *Id.* Both officers then displayed their badges and one of them said, "we both have guns and we know how to use them." *Id.*

[44] *Id.* at 438.

[45] *Id.*

[46] The case against the second officer was dismissed before trial. *Id.* at 437 n.2.

[47] *Id.* at 438.

the assault and identified themselves as police officers, we declined to find that the officer on trial was acting within the scope of his employment based on those mere actions alone.[48]  We concluded instead that the officer's "entire behavior during this incident reflected that of an individual bent on personal vengeance for a perceived personal affront."[49]

Similarly, in *District of Columbia v. Bamidele*,[50] we revisited the question whether off-duty police officers were acting within the scope of their employment after officers assaulted a couple (the Bamideles) at a restaurant.[51]  Concluding that the evidence was insufficient to hold the District vicariously liable for the officers'

---

[48] *Id.*

[49] *Id.*

[50] 103 A.3d 516 (D.C. 2014).

[51]  In *Bamidele*, for purely personal reasons, three off-duty and out-of-uniform officers went to a local restaurant where a confrontation erupted between the officers and a group of unidentified men arising from an attempted sexual assault on one of the officers. *Id.* at 519.  As part of the altercation, the officers and unidentified men engaged in a food fight where they tossed both food and objects at one another across the restaurant. *Id.*  While tossing objects, one of the officers threw a plate toward the unidentified men, and it shattered against the wall near Mrs. Bamidele's head, although neither she nor her husband had been involved in the initial altercation. *Id.*  When confronted by Mr. Bamidele about the plate's almost striking his wife, one of the officers (who did not throw the plate) punched Mr. Bamidele. *Id.* at 520.  The "officers then viciously assaulted" the couple. *Id.*

assaultive actions, we explained that, although "at least initially, [the officers] intended to take police action against the unidentified men in response to an assault" on one of the officers, "they did not intend to take police action against" the Bamideles.[52] "[N]or did the Bamideles become accidentally entangled in the officers' scuffle with the unidentified men."[53] Rather, the assault on the Bamideles "seem[ed] to have been precipitated by Mr. Bamidele's comment" to one of the officers regarding a plate almost striking his wife.[54] The officers' assaultive conduct against the Bamideles, therefore, was in no way connected to, or in furtherance of, their duties as police officers.

Unlike in *Coron* and *Bamidele*, the evidence here reveals that Officer Modlin's professional and personal motives for his actions toward Blair were significantly intertwined. In his deposition testimony, Officer Modlin attested that before the altercation erupted, he and Blair had an exchange outside the Lotus Lounge concerning Blair's drunken behavior. Officer Modlin identified himself as a police officer, displayed his badge "that was sitting on [his] hip," and directed

---

[52] *Id.* at 525-26.

[53] *Id.* at 526.

[54] *Id.*

Blair to calm down and leave the area.[55] Officer Modlin considered himself "on duty . . . as the events were unfolding."

At a certain point, moreover, Officer Modlin began to react to an assault on fellow officers, as well as on bouncers from the Lotus Lounge — as was his duty.[56] Officer Modlin testified on deposition that he "didn't enter the altercation; the altercation was thrust upon" him, and that "the only thing [he] had was survival instincts to, one, protect Officer Goins and Officer McRavin and, secondarily, to protect the bouncers who came out to assist us." When questioned about his decision not to "interven[e] as a police officer to effect an arrest" after the assault on one of his fellow officers, he explained "it wasn't feasible"; "it was total chaos"; and "[t]o sit there and try to detain one of them would have meant that we would have subjected ourselves to possibly being assaulted while trying to hold him there, as we didn't have handcuffs."[57] We believe that a jury could reasonably

---

[55] *Cf. Coron*, 515 A.2d at 437-38 (after leaving his car and approaching the plaintiff for personal reasons, officer displayed his badge and identified himself as a police officer after assaulting plaintiff).

[56] *See* D.C. Code § 5-115.03 (2012 Repl.) ("If any member of the police force shall neglect making any arrest for an offense against the laws . . . committed in his presence, he shall be deemed guilty of a misdemeanor . . . .").

[57] Officer Modlin described his thought-process the night of the assault. He attested:

(continued…)

infer from this testimony that Officer Modlin's eventual assault on Blair was an "outgrowth of the [District's] instructions or job assignment" or "an integral part of the [District's] business activity, interests, or objectives" pursuant to D.C. Code § 5-115.03.[58]

The District argues, however, that Officer Modlin's additional testimony — that he had been struck in the back of the head just before entering the melee — is evidence that his actions were driven only to satisfy a personal vendetta. To be sure, this is evidence that Officer Modlin may have been motivated to join the melee, in part, because he was struck in the back of the head. But evidence of partial motivation is not conclusive as to whether an employee's conduct is outside the scope of employment. To reinforce the rule identified earlier, we stress that an

---

(…continued)

> Now, you may ask yourself, why didn't we lock him up at that point? Because that would have been like sticking a stick into a bee hive, knowing that all these guys out there are drunk; as soon as we put our hands on them, seeing that he doesn't — has no care or respect — that we're the police, that we're going to get into a fight.

[58] *Penn Cent. Transp. Co.*, 398 A.2d at 32; *see also Brown*, 782 A.2d at 758 (summary judgment for employer improperly granted on ground that conduct was not within scope of employment, where employee (security guard), who searched customer with "reason to believe that his employer's interests had been affected," then sexually assaulted the customer).

employee's conduct will be outside that scope only if the employee's actions are "entirely disconnected from the work of the master, or the actions . . . were done solely for the accomplishment of the independent . . . mischievous purpose of the servant."[59]  The District has not identified any evidence, nor can we discern any of record, that demonstrates Officer Modlin was engaged in a purely personal venture unmotivated in any way by furthering the interests of the Metropolitan Police Department.[60]

Viewing the evidence presented (in particular, both Blair's and Officer Modlin's deposition testimonies) in the light most favorable to Blair, as we must, we conclude that a reasonable jury could find that Officer Modlin's conduct was, at least in part, actuated in furtherance of the District's interests.  Accordingly, the

---

[59]  *Bamidele*, 103 A.3d at 530 (Reid, J. concurring in part and dissenting in part) (quoting *Great A&P Tea Co. v. Aveilhe*, 116 A.2d 162, 165-66 (D.C. 1955)) (internal quotation marks omitted).

[60]  *Compare id.* at 525-26 (officers' conduct outside scope of employment where officers assaulted an innocent bystander while engaged in a food fight with unidentified restaurant patrons); *Boykin*, 484 A.2d at 562 (no vicarious liability for teacher's sexual assault of student at school during school day as teacher's assault "was in no degree committed to serve the school's interest, but rather appears to have been done solely for the accomplishment of [the teacher's] independent, malicious, mischievous and selfish purposes"); *Penn Cent. Transp. Co.*, 398 A.2d at 32 (employee's assault on cab driver was outside scope of employment where altercation was in no degree connected to employment or employer's interests but rather was done solely to achieve employee's personal motives).

District was not entitled to summary judgment. Whether Officer Modlin's assault on Blair during the melee outside the Lotus Lounge was motivated in part by his desire to serve the District as a police officer, or was entirely motivated by his desire for vengeance upon being struck, are questions of fact for a jury to answer.

## VII.  Negligent Hiring, Training, and Supervision

Blair asserts, finally, that expert testimony was not required to establish the standard of care governing his negligent hiring, training, and supervision claim because, he says, "common sense alone suggests the District failed in its duty to properly supervise — or terminate — a police officer such as Modlin, who already had been disciplined on ten separate occasions prior to the underlying incident." We conclude, to the contrary, that although there conceivably could be negligent supervision claims for which lay jurors would be able to "grasp the issues without expert assistance,"[61] the trial court did not abuse its discretion in ruling that Blair's claim was not one of them.

In an action against an employer for negligent supervision, liability is

---

[61] *District of Columbia v. Tulin*, 994 A.2d 788, 795 (D.C. 2010).

"predicated upon the employer's direct negligence, rather than under a theory of vicarious liability based on the employee's negligence."[62]  "To establish a cause of action for negligent supervision, a plaintiff must show:  that the employer 'knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge failed to adequately supervise the employee.'"[63]   Negligent supervision and retention claims therefore require "proof that the employer breached a duty to plaintiff to use reasonable care in the supervision or retention of an employee which proximately caused harm to plaintiff."[64]

For a plaintiff to satisfy the applicable standard of care, we have often,

---

[62]  *Phelan v. City of Mount Rainier*, 805 A.2d 930, 937 (D.C. 2002) ("When the employer itself breaches a duty of care which proximately results in injury to a third party, 'the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment.'") (quoting *Fleming v. Bronfin*, 80 A.2d 915, 917 (D.C. 1951)).

[63]  *Id.* at 937-38 (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985)).

[64]  *Id.* at 940; *accord Schecter*, 892 A.2d at 431 ("One dealing with the public is bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee.  When an employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment.") (quoting *Fleming*, 80 A.2d at 917).

though not always, required expert testimony.[65] "The decision whether to admit or require expert testimony on a particular state of facts is confided to the sound discretion of the trial court, and we have described that discretion as 'broad.'"[66]

Thus, the question here is whether the trial court abused its discretion in requiring expert testimony to establish the standard of care. We have frequently "affirmed trial court rulings that expert testimony is required to establish the standard of care in negligence cases that involve 'issues of safety, security and crime prevention.'"[67] Consistent with those rulings, we can find no basis for upsetting the trial court's determination that expert testimony was required because

---

[65] *See Clark v. District of Columbia*, 708 A.2d 632, 634 (D.C. 1997).

[66] *Varner v. District of Columbia*, 891 A.2d 260, 266 (D.C. 2006); *accord Tulin*, 994 A.2d at 795.

[67] *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1039 (D.C. 2014) (citations omitted); *see also District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1987) ("Here, the question whether the District was negligent in failing to train its police officers adequately with regard to dealing with mentally disturbed persons or persons under the influence of drugs could be answered only if the jury was made aware of recognized standards concerning such training."); *White*, 442 A.2d at 164-65 ("[Q]uestions of adequate weapons safety training and evaluation are technical questions not sufficiently within the common experience of jurors to obviate the need for expert testimony" at trial before jury); *cf. Tulin*, 994 A.2d at 795-97 (no expert testimony concerning applicable standard of care was required where sergeants authorized arrest of plaintiff, without questioning the detective making the arrest as to her reckless driving prior to arrest, because violation of standard of care in this case was within realm of common knowledge and every day experience).

the activities at issue here — training, supervision, and retention of police officers — are not within the common, everyday experiences of laypersons.[68]

Nonetheless, says Blair, the testimony of his two experts, who "are familiar with the applicable standard of care," satisfied the requirements for expert testimony and created a genuine dispute of material fact as to the District's liability. Thus, "any perceived deficiency," he says, "goes to the weight of the experts' testimony, not the admissibility of the experts' testimony."

We do not agree. In a case such as this one, where "the plaintiff must depend on expert testimony, it is not sufficient for the expert to explain what he or she would have done under similar circumstances, or to declare that the District violated the national standard of care."[69] To the contrary, "the expert must clearly articulate and refer to a standard of care by which the defendant's actions can be measured."[70] The present case is no different. Both experts testified in deposition

---

[68] *See Holder*, 700 A.2d at 741 (requiring expert testimony to establish whether officer violated standard of care when he shot an individual).

[69] *Pannell v. District of Columbia*, 829 A.2d 474, 479 (D.C. 2003) (quoting *Phillips v. District of Columbia*, 714 A.2d 768, 773 (D.C. 1998)).

[70] *Id.* (quoting *Phillips*, 714 A.2d at 773).

in conclusory terms that, in their opinions, the District's supervision of Officer Modlin fell below "the national standard of care," and that the District should have taken stronger disciplinary action against Officer Modlin, "a troubled employee" with a history of excessive force complaints. But, as the trial court explained at length, the record contains no elaboration as to what the national standard requires for training, retention, and supervision of police officers, or how the District's actions were deficient. Such conclusory statements are insufficient to establish a standard of care.[71]

Discerning no abuse of discretion in the trial court's findings, we conclude that summary judgment for the District was appropriately granted on Blair's claim for negligent supervision and training. That said, we reiterate the concerns articulated in our prior decision in this case: "The allegation that appellant, a mere bystander to an altercation, was attacked as he lay on the ground raises serious questions regarding the District's training of its officers," particularly in light of the record evidence of Officer Modlin's pattern of excessive force, both in and out

---

[71] *See Etheredge*, 635 A.2d at 917-18 ("[Plaintiff] introduced no evidence as to the circumstances under which Officer Paige was hired, or as to the nature and the sufficiency of the training and supervision provided to Paige. The plaintiff's expert witness testified in conclusory terms that, in his opinion, the 'training in this case was improper,' but the record contains no factual elaboration of the respect in which this was true.").

of uniform.[72]

## VIII.  Conclusion

We affirm summary judgment for Officer Modlin on Blair's claims for negligence and gross negligence, as well as for the District on Blair's claims for negligence and for negligent hiring, training, and supervision.  We reverse summary judgment for the District on Blair's claim for assault and battery based on *respondeat superior*.  We remand the case for further proceedings consistent with this opinion.

*So ordered.*

---

[72]  *See Blair v. Lotus Lounge*, No. 13-CV-779, Mem. Op. & J. at 7 (D.C. Sept. 30, 2014); *supra* note 3.